484 F.2d 1065
 Nikolaos BASSIS et al., Plaintiffs,
v.
UNIVERSAL LINE, S.A., and Universal Cruise Lines, Inc.,
Defendants-Appellees, and S. S. CARIBIA, her
Engines, Boilers, Tackle, etc. the City
of New York, Claimant-Appellant.
 No. 734, Docket 73-1035.
 United States Court of Appeals,
Second Circuit.
 Argued April 26, 1973.
Decided June 8, 1973.
 
 Judah Dick, New York City (Norman Redlich, Corp. Counsel of the City of New York, R. Harcourt Dodds and Edward J. McLaughlin, New York City, of counsel), for claimant-appellant City of New York.
 John S. Rogers, New York City (Burlingham, Underwood & Lord, New York City, of counsel), for defendants-appellees.
 Terence Gargan, New York City (Harlington Wood, Jr., Asst. Atty. Gen., Robert A. Morse, U. S. Atty., E. D. N. Y., Gilbert S. Fleischer, Atty. in Charge, Admiralty and Shipping Section, New York, and Philip A. Berns, Atty., Admiralty and Shipping Section, Dept. of Justice, New York City, of counsel), for the U. S. Marshal for the Eastern District of New York.
 Before KAUFMAN, Chief Judge, and BREITENSTEIN* and MANSFIELD, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 We have here another episode in the woeful tale of the S.S. CARIBIA. For prior installments see Bassis v. S.S. CARIBIA, E.D.N.Y., 309 F.Supp. 989, and Bassis v. Universal Line, S.A., 2 Cir., 436 F.2d 64. The present dispute relates to wharfage charges of the City of New York and the issue is City's right to have the reasonable cost of wharfage taxed as administrative expense. The appeal by City is from the district court's denial of its claim. No libellant has appeared in this appeal. The marshal seeks a determination of whether the City's claim is an administrative expense. Jurisdiction lies under 28 U.S.C. Sec. 1292(a)(3); see also In re Wills Lines, 2 Cir., 227 F.2d 509, 510, cert. denied 351 U.S. 917, 76 S.Ct. 709, 100 L. Ed. 1450.
 
 
 2
 The 32,000-ton passenger liner CARIBIA, owned by Universal Line, S.A., was arrested by the United States Marshal for the Eastern District of New York on April 21, 1969, under a warrant of attachment. Later at the behest of other creditors successive arrests were made and the various actions consolidated. The peregrinations of CARIBIA around New York harbor must be noted.
 
 
 3
 1-Arrested at Todd shipyards.
 
 
 4
 2-Moved to a Gravesend Bay anchorage under a June 13, 1969, court order.
 
 
 5
 3-Moved to 33rd Street pier under a July 22, 1969, court order.
 
 
 6
 4-Moved to an anchorage under a May 13, 1970, court order.
 
 
 7
 5-Moved on an unstated date in the summer of 1970 to pier 86 without court order or permission of City.
 
 
 8
 6-Moved to pier 56 on June 1, 1971, under a May 27, 1971, court order recognizing an agreement between Owner and City.
 
 
 9
 The 33rd Street pier and piers 86 and 56 are all City facilities. A dispute to be noted later arose between Owner and City over the use of pier 86. This dispute was resolved by a settlement agreement dated October 30, 1970, but apparently not executed by City until December 3, 1970. We are concerned with City's claim for pier 86 wharfage between December 4, 1970, when City says the vessel should have been moved to pier 56 under the settlement agreement and June 1, 1971, when it was so moved. The City claim does not cover any wharfage at pier 56. So far as the record shows, those charges have been paid by Owner to City.
 
 
 10
 On December 13, 1971, City made demand on the marshal for payment of wharfage charges at pier 86 for the period noted above, amounting to $250 a day for 180 days, or a total of $45,000, as an administrative expense under 28 U.S.C. Sec. 1921 and Rule E(4)(b), (d), and (e) of the Admiralty Rules. The demand was refused. City then moved on February 10, 1972, for an order that (1) the marshal pay the reasonable value of the wharfage, and (2) plaintiffs be required to deposit "such costs on a prorata basis," or (3) "such expense be taxed as costs * * * and that the ship be sold to pay such expenses." The court, on October 31, 1972, denied the motion holding that City had dealt with Owner and, hence, was not entitled to recover wharfage charges as an administrative expense under 28 U.S.C. Sec. 1921. This appeal followed.
 
 
 11
 At all pertinent times the vessel had been and, so far as the record shows, now is in custodia legis, and has not been sold. The law as to whether custodial claimants have priority over precustodial claimants asserting liens "has reached a high point of confusion." Gilmore and Black, The Law of Admiralty, p. 497.
 
 
 12
 City relies on New York Dock Company v. S.S. Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955, which concerned a custodial claim for wharfage when there had been no authorizing court order. Poznan recognizes the rule that "there can be no maritime lien for services furnished a vessel while in custodia legis." 274 U.S. at 120, 47 S.Ct. at 484. The district court had denied a petition to remove the vessel from the custodial claimant's wharf. The Supreme Court commented that the denial was with the consent or knowledge of the libellant and those united in interest, who "appear to have acquiesced" in the denial. 274 U.S. at 122, 47 S.Ct. 482. The Court said that the custodial charges were for the common benefit and "in equity and good conscience, should be satisfied before the libellants may enjoy the fruits of their liens." 274 U.S. at 122, 47 S.Ct. at 484.
 
 
 13
 Owner counters with Larsen v. New York Dock Co., 2 Cir., 166 F.2d 687, which also involved a preferential claim for wharfage of a ship in custodia legis. Two periods were in question. The court found that during the first the dock company "relied solely" on the credit of the libellant which caused the ship to be moved to the wharf of the custodial claimant and during the second period it did not. After observing that the decision in Poznan rested on the doctrine of unjust enrichment, see 166 F.2d 689, and particularly n.2, the court cited as authority Restatement of the Law, Restitution, Sec. 110, p. 455, which states that "A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." Thus, although New York Dock Co. may have conferred a benefit upon the parties claiming an interest in the ship, the court held that its arrangements with a specific party for payment of its wharfage claims precluded reliance upon the Poznan doctrine for recovery when this source proved unavailing. Accordingly, wharfage claims for the first period were denied. As for the second period, when there was no reliance, the court held that "its claim for wharfage . . . comes within the ruling in Poznan," 166 F.2d 689, and allowed the claim to be taxed as an administrative expense.
 
 
 14
 The present state of the law appears to be that under Poznan, wharfage claims arising while a ship is in custodia legis may be allowed a preference over pre-custodial claimants, by means of taxation as an administrative expense, on the basis of "equity and good conscience." No preference will be allowed under Larsen, however, where the custodial claimant relied not on the fund represented by the ship but on the credit of the party which caused the wharfage to be incurred. As stated in Gilmore and Black, The Law of Admiralty, p. 497, the result is that those furnishing custodial services to a ship in custodia legis "are gambling on a wholly unpredictable result unless they take the precaution of having their services authorized in advance by an order of the custodial court."
 
 
 15
 With this background, we turn to the pertinent facts and court orders. The June 13, 1969, order permitting the removal of CARIBIA from the Todd pier to Gravesend Bay anchorage provided that the wharfage claims would be borne by Owner and would not be an administrative expense and that the vessel must be kept within the Eastern or Southern districts of New York. The transfer to the 33rd Street pier was under an order conditioned upon payment by Owner of all expenses and payment of 30-days wharfage in advance. The advance payment was made and wharfage was paid for two more months but was discontinued after a dispute arose between Owner and City. On May 13, 1970, the court ordered that the ship be removed to an anchorage.
 
 
 16
 Then the trouble began. Owner became concerned over the approaching hurricane season and sought a permit from City to tie up the vessel. No agreement was reached and without permission from either City or the court, Owner moved the vessel to pier 86. Owner then commenced a state court action to compel City to issue a permit on what Owner considered reasonable terms. The action was dismissed and Owner appealed. Owner also filed a complaint with the Federal Maritime Commission alleging that City was bound to provide space at the $100 a day rate in its published tariff rather than the $250 a day rate which City proposed to charge. City retaliated by filing various criminal charges.
 
 
 17
 On August 26, 1970, City obtained an order from the court for cause to be shown why the vessel should not be moved from pier 86. A hearing was held, and on September 4, the court filed a memorandum decision which said:
 
 
 18
 "It is accordingly apparent that an order must be forthwith settled on the initiative of any interested claimant directing the marshal to resume custody and providing for immediately advancing or securing the expense of his doing so or else providing for immediate sale."
 
 
 19
 City submitted a proposed order which among other things provided that on nonpayment of costs the marshal was directed to sell CARIBIA at auction. At the October 6 hearing which was held on City's proposal, it was shown that the state court action brought by Owner to compel City to issue a permit had not been finally decided. A suggestion was made that the matter be held in abeyance to await state court action. A decision favorable to Owner would conceivably moot the controversy because Owner had consistently taken the position that it would pay City reasonable wharfage charges. The court took the matter under advisement.
 
 
 20
 Owner and City then made the aforementioned settlement agreement whereby there was a mutual release of claims to that date and City's proposed order was withdrawn. The agreement provided for the issuance of a permit for pier 56 at $100 a day for a 90-day period commencing when necessary dredging was completed. Disputes arose over dredging and other matters. At City's request the court entered a May 27, 1971, order for the removal of the vessel from pier 86 to pier 56. The order provided that the removal should be in accordance with the settlement agreement between City and Owner. Dredging was never completed but CARIBIA was nonetheless moved to pier 56 on June 1, 1971. After a dispute over the furnishing of certain services by City, payment at the agreed rate began on July 8 and has apparently continued.
 
 
 21
 Our only concern is with the pier 86 charges between the time when the settlement agreement required the ship to be moved from that pier until the time when it was so moved. City says that in equity and good conscience it is entitled to have these charges allowed as an administrative expense. Owner says that it is not because City relied solely on Owner for the payment of the charges.
 
 
 22
 In support of its equitable claim, City says that the court accepted responsibility for all custodial costs when it allowed attachment without prepayment of expenses by libellants. Overlooked are the facts that the vessel was moved from the Todd pier to an anchorage, from there to the 33rd Street pier, and from there back to an anchorage under court orders requiring payment of costs by Owner. The nine-month stay at 33rd Street was under an arrangement between City and Owner whereby Owner paid City $7,500 for 30 days advance wharfage and made similar payments for two more months. Nonpayment thereafter resulted, among other things, from a dispute between City and Owner over the rate charged. Thus, City allowed 33rd Street wharfage with full knowledge that the expense was that of the Owner and not an administrative cost.
 
 
 23
 City says that if the ship had not been in custodia legis, City would have removed it from pier 86 and sold it under the authority of city ordinances. The difficulty is that City failed to seek in a timely manner the relief which it might have received from the admiralty court. After the hearing on the August 26, 1970, show cause order and the September 4 memorandum of the court, City on September 8 did submit a proposed order directing the marshal to sell the CARIBIA upon nonpayment of wharfage charges. But before a decision was rendered, the settlement agreement was made, and the proposed order withdrawn by City. The motion for payment of wharfage charges with which we are now concerned was not made until more than a year after the CARIBIA was first moved to pier 86 and after six months of wharfage charges had been allowed to accumulate. In its order from which this appeal was taken the court said City could have made an early move to oust the ship or require payment of wharfage and had it done so "the consequence would not have been the accumulation of charges but a sale of the vessel willynilly, if the [Owner] had failed to discharge the claim without incurring a lien of any kind."
 
 
 24
 City says that the settlement should not be given conclusive effect because it was forced into the settlement. It is a little difficult to comprehend how the great City of New York could be forced by a shipowner to settle a wharfage dispute. City insists that haste was essential because of a contemplated lease of pier 86 to the Port Authority of New York. The record shows that the lease was made on April 2, 1971, substantially after the settlement date, and began May 14 before the June 1 removal of the ship. In any event, the settlement agreement and its attendant circumstances were not brought to the attention of the court until the May 14 motion was filed.
 
 
 25
 Finally, City's equity and good conscience argument collides head-on with the trial court's holding that City dealt with Owner and no one else. The facts sustaining this conclusion have been outlined. The arrangements for the 33rd Street pier and the settlement of the dispute over the charges for pier 86 are most persuasive. City relied on Owner and, having done so, is in no position to now assert a belated preferential claim. Under Larsen v. New York Dock Co., 2 Cir., 166 F.2d 687, City is not entitled to recover the pier 86 wharfage charges in dispute as an administrative expense.
 
 
 26
 Affirmed.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 27
 I respectfully dissent.
 
 
 28
 In my view the majority's decision rewards the owner and creditors of a trespassing ship for the owner's misconduct, which was permitted to continue with resulting benefit to the ship because the ship was in the district court's custody. The effect is unjustly to enrich the shipowner and other creditors at the expense of the party wronged, in this case the City of New York. I believe the proper rule to be that where a ship in custodia legis trespasses upon another's wharf in order to gain resulting benefits, including protection from hurricanes, the failure of the admiralty court promptly to order removal of the ship, once removal has been requested and the court is aware of the benefits being realized by the ship from its continued trespass, entitles the wharf owner to preferential payment for resulting wharfage charges. The inaction of the court having custody of the ship amounts to permission for or acquiescence in the provision of wharfage services beneficial to the vessel's preservation. New York Dock Co. v. S.S. Poznan, 274 U.S. 117, 122-123, 47 S.Ct. 482, 71 L.Ed. 955 (1927).
 
 
 29
 Though the S.S. Caribia had trespassed upon a City-owned pier, the district court failed for a period of several months to order the removal or sale of the vessel, which was in its custody, despite prompt application by the City for relief and the court's recognition at the outset that the City was entitled to such relief. Frustrated in its efforts to obtain relief and unable, because the ship was in federal custodia legis, to use self-help or to take remedial action under its own Administrative Code without being held in contempt, the City finally capitulated and entered into a wharfage agreement with the shipowner. As a result, the shipowner and creditors received substantial benefits which they would not have realized if the district court had granted the relief to which the City was clearly entitled. Under the circumstances a wooden-like and literal application of the rule that in the absence of a specific court order a custodial claim will not normally be allowed as an administrative expense strikes me as unconscionable. In my view the district court's failure for almost three months to sign the order submitted to it by the City amounted to an acquiescence in or approval of the City's claim as an administrative expense entitled to preferential payment.
 
 
 30
 The essential facts are simple and undisputed. On August 15, 1970, the S.S. Caribia, then in custody of the United States District Court for the Eastern District of New York pursuant to creditors' attachments, and requiring shelter in the face of the imminent hurricane season, trespassed upon Pier 86, owned by the City of New York, by mooring to the bollards along the bulkhead of the pier. The City, acting pursuant to Sec. 704-2.0 of its Administrative Code, which authorizes it to remove and sell such a squatting ship at auction, immediately ordered the vessel to vacate the pier, which normally rented at $250 per day. However, the shipowner refused to comply, the ship being in federal court custody.
 
 
 31
 On August 26, 1970, the City promptly applied to the district court for an order directing that the vessel in the court's custody be removed from the pier or be required to pay the regular wharfage rate of $250 per day. Under 28 U.S.C. Sec. 1921 the U.S. Marshal, who had legal custody of the ship pursuant to the district court's order dated April 21, 1969, was required to obtain from the libellants a deposit in advance to cover expenses, including wharfage, which would become administrative expenses entitled to preferential payment.[1] In this case, however, the Marshal sought to avoid responsibility in the matter on the grounds that (1) although the ship was in his custody pursuant to Supplemental Admiralty Rule E(4)(b),[2] the shipowner had agreed to pay all expenses, and (2) that the Marshal was unable to pay for wharfage because adequate funds had not been provided by the parties to meet such expenses. The creditors were apparently content with the status quo as long as the wharfage fees would not become a first charge against the ship, which was the asset relied upon by them to satisfy their claims.[3]
 
 
 32
 *****
 
 
 33
 * * *
 
 
 34
 *****
 
 
 35
 * * *
 
 
 36
 *****
 
 
 37
 * * *
 
 
 38
 On September 4, 1970, the district court denied the City's motion for removal of the ship, pointing out that removal would leave the vessel without a berth. At the same time, recognizing that the ship was trespassing on the City's waterfront, Judge Dooling stated that if the parties could not reach an agreement with respect to wharfage charges,
 
 
 39
 "[t]he only practical order is one that will terminate the present arrangement in favor of the marshal's resumption of custody in usual form. If the parties are unwilling to advance the expense of the marshal's custody, it will not be possible to stave off sale.
 
 
 40
 "It is accordingly apparent that an order must be forthwith settled on the initiative of any interested claimant directing the marshal to resume custody and providing for immediately advancing or securing the expense of his doing so or else providing for immediate sale."
 
 
 41
 When the parties failed to reach agreement, the City, on September 8, 1970, acting in accordance with the court's September 4 decision, submitted a proposed order along the lines directed by the court, which would have required the Marshal to lease a different pier from the City at $250 a day to be paid out of funds to be advanced by the owner and creditors, failing which the Marshal would sell the vessel. Instead of signing the order, however, the court held a hearing on October 6, 1970, attended by the City and various creditors but not by the shipowner. At this hearing the City made crystal clear its demand that the S.S. Caribia be removed from Pier 86 and that past and any future wharfage charges be treated as an administrative expense entitled to priority over the liens of the mortgagees. Mr. Dick, counsel for the City, stated to the court:
 
 
 42
 "I meant we want the boat out of pier 86 immediately. We want it in the Brooklyn pier, we want a permit issued to the marshal so that eventually if the owner does not pay, we have a first administrative claim on this vessel, or at least equal with other people who have administrative claims."
 
 
 43
 Although the court indicated that in the absence of a court order directing that the Marshal "be put in funds" to satisfy such charges or that the vessel be sold, the wharfage charges probably could not be treated as administrative expenses, the record reveals that the court clearly understood the City's position in the matter.[4] This, therefore, is not a case where the City looked only to the credit of the shipowner. Cf. Larsen v. New York Dock Co., 166 F.2d 687, 689 (2d Cir. 1948). Notwithstanding the fact that more than one month had elapsed since the City had moved for relief and nearly a month had passed since the City had submitted an order pursuant to the court's decision of September 4, the court, apparently desirous of avoiding a forced sale of the vessel to satisfy custody charges, took no action other than to announce that it would "take [the City's proposed] order under advisement."
 
 
 44
 *****
 
 
 45
 * * *
 
 
 46
 *****
 
 
 47
 * * *
 
 
 48
 Thus the City in its effort to gain the relief to which it was clearly entitled was frustrated by the court's inaction. There followed several more weeks without any action on the part of the court. Meanwhile the trespassing vessel remained as a squatter at Pier 86, realizing benefits for its owner and creditors to which they were not entitled. The City was anxious to enter into a lease with the Port Authority for rehabilitation of Pier 86 but was prevented from doing so by the presence of the vessel. By October 30, 1970, approximately two months had elapsed since the court's decision and the City's submission of the proposed order. With no alternative but to wait indefinitely, the City finally negotiated a settlement with the shipowner under which the City would waive its rent claims on condition that the owner would move the vessel to Pier 56 and do the dredging required to enable the ship to be berthed at that pier. The agreements embodying the settlement, however, were not signed until December 3, 1970. Finally, no order having been signed by the district court for over three months, the parties on December 8, 1970, filed a stipulation withdrawing the City's proposed order.
 
 
 49
 Upon the foregoing record I cannot agree with the majority's conclusion that the "City failed to seek in a timely manner the relief which it might have received from the admiralty court." On the contrary, the record reveals that the City acted promptly, but was frustrated by months of delay on the court's part in failing to sign an order granting it the relief to which it was entitled. While I concur in the majority's characterization of the City of New York as "great," I do not share its difficulty in apprehending how the City was forced, notwithstanding its greatness, to settle the dispute. The City simply had no alternative. The district court had sole and exclusive custody of the S.S. Caribia. If the City had attempted to move the ship from Pier 86 without the district court's approval, the City would have been in contempt.
 
 
 50
 The linch-pin of the majority opinion is its reliance upon the rule that charges for services rendered to a ship in custodia legis may not ordinarily be treated as an administrative expense in the absence of permission from the custodial court. Gilmore & Black, The Law of Admiralty 497 (1957). However, this rule is subject to the equitable principle that where a court permits a vessel to receive the benefit of essential services with knowledge that the party rendering them looks to the court for preferential payment, the charges may be treated as administrative expenses. New York Dock Co. v. S.S. Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927); Pyne v. Oil Screw Fishing Vessel Chrisway, 298 F.Supp. 1160 (S.D.Ga.1969); Roy v. MV Kateri Tek, 238 F.Supp. 813 (E. D.La.1965).
 
 
 51
 The present case is on all fours with S.S. Poznan, supra, where the Supreme Court held that, notwithstanding the lack of any prior judicial authorization or contractual arrangement for wharfage, the New York Dock Co. was entitled to allowance of its claim for wharfage provided to a vessel in custodia legis as an administrative expense. The Court of Appeals had denied the claim on the same ground as that adopted by a majority here, namely, that the wharfage agreement had been made with the owner and not with the custodian of the ship, 9 F.2d 838, 844 (2 Cir. 1925). In reversing the Court of Appeals the Supreme Court expressly affirmed the decision of district judge Learned Hand, 297 F. 345, at page 346 (S.D.N.Y.1923), where in he stated:
 
 
 52
 "The ship is in the custody of the court, and the court alone can pledge her upon such a lien; there must be some one authorized to create consensual liens. The marshal cannot, and obviously the owner cannot. Hence the Polish-American Navigation Company by its contract could not create any lien after the marshal once took charge. The contract did not at once create a lien for the whole period; that arose de die in diem, and ceased on December 2 [the date when the ship was arrested by the marshal], if it ever began at all. Hence, in so far as this bill depends upon a maritime lien, it must fail.
 
 
 53
 "However, it is not necessary to deny the libelant all relief under the libel, if it has any against the fund in court. If the lienors, who are entitled to the whole of that fund, have in fact enjoyed the benefit of the wharfage service, to the extent of that benefit they may be called on to respond, upon familiar principles. This was the course pursued in The St. Paul, 271 F. 265 (C.C.A. 2). The Poznan required wharfage while under arrest; she required the wharfage which she got, or at least the creditors' committee of lienors, or a majority of them, thought so."
 
 
 54
 Thereafter Judge Augustus N. Hand, in allowing the full claim of New York Dock Co. as an administrative expense, stated:
 
 
 55
 "The ship was at the libellant's pier and the cargo owners kept her there. They received the benefit of shelter and discharge from use of libellant's property. I can conceive of no reasonable measure of this benefit except the reasonable value of the particular wharfage enjoyed and the incidental services rendered." (See Record on Appeal, Vol. 116, October 1926 Term, Library of the Assn. of Bar of the City of New York).
 
 
 56
 The foregoing principles were expressly approved by the Supreme Court in New York Dock Co. v. S.S. Poznan, supra, 274 U.S. at 120-121, 122-123; 47 S.Ct. at 484:
 
 
 57
 "[W]e think petitioner's right of recovery depends, as the district court ruled, not upon the existence of a maritime lien, but upon principles of general application which should govern whenever a court undertakes the administration of property or a fund brought into its custody for the benefit of suitors.
 
 
 58
 "The libellants in the consolidated cause were not only concerned as owners in securing delivery of the cargo, but as lienors they were interested in the ship and, as eventually appeared, in the whole of her proceeds. Service rendered to the ship after arrest, in aid of the discharge of cargo, and afterward pending the sale, necessarily inured to their benefit, for it contributed to the creation of the fund now available to them.
 
 
 59
 ******
 
 
 60
 * * *
 
 
 61
 "But in the present case [the court below] thought that The St. Paul case was to be distinguished on the ground that there the wharfage service was furnished and the obligation incurred in accordance with an order made by the court and with the consent of the libellants. But here the court denied a motion to remove the ship from petitioner's wharf with the consent of some of the libellants and with full knowledge of all concerned that the wharfage was then being furnished. The libellants in the consolidated cause, who are united in interest with respondent in the present case, thus appear to have acquiesced in this determination. . . . It is enough if the court approves the service rendered or permits it to be rendered, and it inures to the benefit of the property or funds in its custody." (Emphasis supplied).
 
 
 62
 Here, as in S.S. Poznan, the district court, shipowner and creditors were all concerned, because of the dangers of the hurricane season, with the safety of the vessel, which represented the asset in the court's custody to which the creditors had to look as security for their claims. As in the S.S. Poznan all parties except the City stood to benefit from the vessel's continued berthage at the City's pier. Although there was nothing to prevent it from doing so, the district court declined for a period of three months to order the removal of the vessel from Pier 86, thus permitting it to remain at the pier with full knowledge that the City was demanding that the wharfarge, which was being unilaterally exacted for the benefit of the owner and creditors, be paid for as an administrative expense. As the Supreme Court stated in S.S. Poznan, where the court thus "permits it [wharfage] to be rendered, and it inures to the benefit of the property or funds in its custody," the wharf owner is entitled to preferential payment from the proceeds of the vessel. This principle was later applied by us in Larsen v. New York Dock Co., 166 F.2d 687, 690 (2d Cir. 1948), where Judge Frank stated:
 
 
 63
 "In the instant case, the court, before the ship's sale, had made no order approving the service rendered or permitting it to be rendered. Nevertheless, we think that, as the ship had to be wharfed somewhere, and since the other parties knew of the wharfage, were 'enriched' by it, and took no steps, after September 6, to provide wharfage elsewhere, the Dock Company is entitled to a preferred claim for the period from September 6, to November 22, 1946."
 
 
 64
 In my opinion the record before us mandates the identical disposition of this appeal.
 
 
 
 *
 Of the United States Court of Appeals for the Tenth Circuit, sitting by designation
 
 
 [1]
 "Sec. 1921. United States marshals' fees
 "Only the following fees of United States marshals shall be collected and taxed as costs, except as otherwise provided:
 "For the keeping of property attached (including boats, vessels, or other property attached or libeled) actual expenses incurred, such as storage, moving, boat hire, or other special transportation, watchmen's or keepers' fees, insurance, and $3 per hour for each deputy marshal required for special services, such as guarding, inventorying, moving, and so forth. The marshals shall collect, in advance a deposit to cover the initial expenses for such services and periodically thereafter such amounts as may be necessary to pay such expenses until the litigation is concluded; . . ."
 
 
 [2]
 "Rule E. Actions in Rem and Quasi in Rem; General Provisions
 "(4) Execution of Process; Marshal's Return; Custody of Property.
 "(b) Tangible Property. If tangible property is to be attached or arrested, the marshal shall take it into his possession for safe custody. If the character or situation of the property is such that the taking of actual possession is impracticable, the marshal shall execute the process by affixing a copy thereof to the property in a conspicuous place and by leaving a copy of the complaint and process with the person having possession or his agent. In furtherance of his custody of any vessel the marshal is authorized to make a written request to the collector of customs not to grant clearance to such vessel until notified by the marshal or his deputy or by the clerk that the vessel has been released in accordance with these rules."
 
 
 [3]
 Counsel for Todd Shipyard, a creditor as a result of providing wharfage for the vessel at an earlier date, summarized the situation as follows:
 "Most of the mortgagees have little or nothing to be gained by anything but cooperating with the owner. They are perfectly willing for a year and a half to have the ship resting at anybody's expense; are unwilling to see that the bills are paid, are unwilling to have them treated as a maritime lien and unwilling to have them treated as an administrative expense. Nor are they willing to put up any money to protect the ship while its in custody under their attachments. They want the best of all sides of the coin. They don't care that the owner has run up bills of 50 or 60 thousand dollars with the city and forty thousand dollars with Todd. That's one hundred thousand dollars."
 
 
 [4]
 The court's clear understanding of the City's position may be gathered from the following, among other colloquys:
 "The Court: No, the part that concerns me and I suppose the rest of you is Mr. Dick's suggestion that the city is so situated that it now could, if not otherwise satisfied, present a claim in the amount of $41,750 in prior time to all other claims other than administrative ones, is that you said? [sic]
 "Mr. Dick: I think it would be an administrative claim equal with all other administrative claims.
 "Mr. Dick: Well, your Honor, the city never waived any lien which it had. It at all times knew that the vessel was around and it was hoping that this would be repaired and be put back into operation as soon as possible. Over the -Every time the ship owner came in, he came in for a permit or an extension or something, for a month, after this he was going to be back in operation. The city never perhaps billed the marshal or came to this Court asking for relief, which it plans to do now; however it never surrendered its lien, it has never foregone it, it knew that it had a lien or a possible lien against the vessel, and since the prospects for refinancing have become dimmer, it is interested in securing both as to the past and certainly as to any future bills which are going to be run up, because it does not see very much prospect of collecting it from Universal Lines.
 "The Court: Well, the future is quite another matter.
 "The Court: No, in the city's contention they will make the argument that it's an administrative expense."