[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-12220
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 27, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-62225-CV-JIC

DRESDNER BANK AG,
Dresdner Bank AG in Hamburg,
NORDDEUTSCHE LANDESBANK-GIROZENTRALE,
KREDITANSTALT FUR,

Plaintiffs-Appellees.

BLOHM AND VOSS GMBH et al.,

Intervenors-Plaintiffs,

STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION
(BERMUDA) LTD.,

Intervenor-Plaintiff
Appellant,

versus

M/V OLYMPIA VOYAGER, a 157.90 meter Blohm Voss
GmbH motor vessel, Hull No. 961,
Greek official number 10750, her engines tackle
equipment, rigging, dinghies, furniture,
appurtenances, etc., in rem, and Olympic World
Cruises, Inc. her owner, in personam,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 27. 2006)**

Before DUBINA,  MARCUS and COX, Circuit Judges.

MARCUS, Circuit Judge:

Steamship Mutual Underwriting Association ("Steamship") appeals from a district court's final judgment awarding Steamship the principal sum of $61,186.15 and prejudgment interest in the amount of $3,661.72 to satisfy a maritime lien it held against the M/V Olympic Voyager (the "Voyager" or "vessel"), a cruise ship. Steamship claims that the district court made two basic errors in calculating the quantum of its lien: first, the court improperly held that the vessel's arrest cut short the accrual of Steamship's maritime lien for unpaid insurance premiums; and then, it improperly calculated the amount of Steamship's lien by considering only the value

2

of insurance invoiced, rather than the insurance provided, before the vessel's arrest. Steamship also says that the district court erred by denying, as untimely, its Rule 59 motion to alter or amend judgment. Because the district court clearly erred in calculating the quantum of Steamship's lien, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

## I.

Olympic World Cruises ("OWC") owned the Voyager and operated it as a cruise ship in the Mediterranean and the Carribean. Dresdner Bank AG in Hamburg, Norddeutsche Landesbank-Girozentrale, and Kreditanstalt FÜR Wiederaufbau (the "Plaintiff Banks") held a First Preferred Ship's Mortgage on the vessel. In 2003, OWC defaulted on its obligation to the Plaintiff Banks, and on December 16, 2003 the Plaintiff Banks commenced this action to foreclose their mortgage.[1] The Plaintiff Banks had the Voyager arrested and obtained a default judgment against the vessel, whereupon the district court ordered the vessel's sale at auction. The Plaintiff Banks then purchased the vessel at auction, and, as a condition of the sale, the district court

---

[1] Also on December 16, 2003, OWC filed a voluntary petition for bankruptcy under Chapter 11 in the United States Bankruptcy Court, District of Hawaii. The bankruptcy court issued an automatic stay that prevented the immediate arrest of the Voyager. Then in January, 2004, pursuant to an agreement between OWC and the Plaintiff Banks, the bankruptcy court entered an order modifying the automatic stay to allow the commencement and prosecution of actions in rem and in personam by any and all creditors asserting maritime liens against the Voyager, which allowed this action to proceed.

ordered them to defend any claims against the vessel, in rem.

Steamship is a mutual insurance association that provided protection and indemnity ("P&I") insurance to vessels owned by OWC, including the Voyager. Under the terms of the Voyager's insurance policy, the vessel's yearly premium was assessed in six installments, four of which were invoiced during the policy year and two of which were invoiced in years thereafter. But if the vessel did not renew its insurance with Steamship, all obligations for previously provided insurance came due. This acceleration of payments upon cancellation was known as a "release call."

When the vessel was arrested on January 19, 2004, Steamship had invoiced premiums for the Voyager equaling $61,186.15. In addition, OWC owed further premium amounts for pre-arrest insurance that had not yet been invoiced. According to Steamship, the entire amount of P&I insurance premiums OWC owed for insurance provided to the Voyager during policy years 2001, 2002, and 2003, exclusive of premiums for insurance provided after the vessel's arrest, totaled $274,770.11.

On March 8, 2004, Steamship intervened in this action and filed a verified complaint in rem against the Voyager asserting a maritime lien for unpaid insurance premiums or, in the alternative, an administrative claim and right of priority payment under the doctrine of custodia legis. The Plaintiff Banks, pursuant to the district court's order requiring them to defend the Voyager, answered Steamship's complaint

4

on the vessel's behalf. Thereafter, in October 2004, the district court conducted a bench trial to adjudicate the claims of all the intervening plaintiffs against the Voyager.

At trial, Steamship presented the testimony of a fact witness, Jonathan Andrews, Steamship's underwriter for the Voyager account, and an English law expert, Charles Brown. The Plaintiff Banks presented no rebuttal witnesses and submitted no evidence. On November 29, 2004, the district court entered extensive Findings of Fact and Conclusions of Law, including these:

(1)     Steamship's provision of P&I insurance to the Voyager gave rise to a maritime lien under the Federal Maritime Lien Act, because such insurance is a "necessary."

(2)     Steamship's maritime lien takes priority over the Preferred Ship Mortgage held by Plaintiff Banks.

(3)     Steamship's provision of insurance to the vessel after the marshals arrested it does not give rise to a maritime lien because no new maritime liens may arise after the vessel is actually arrested. Nor is Steamship entitled to recover for its provision of post-arrest insurance under the doctrine of in custodia legis, because the vessel's arrest was actual, notice of arrest was published, and Steamship did not obtain permission from the court to provide the Voyager with insurance.

(4)     Steamship's witness Jonathan Andrews testified that $61,186.15 is the correct amount owed by the Vessel at the time of arrest. Since no further lien accrued after the arrest, the total amount of Steamship's preferred maritime lien equals $61,186.15.

Following entry of final judgment, on January 20, 2005, Steamship timely filed

a motion to alter or amend the judgment or to correct a clerical error in the judgment,

pursuant to Federal Rules of Civil Procedure 59(e) and 60(a).[2] The motion contained

a typographical error in one of its tables, causing Steamship to file an amended

motion on February 9, 2005. The district court denied Steamship's motion as being

untimely because the amended motion "rendered Steamship's original motion of no

legal effect" and the amended motion was filed outside Rule 59(e)'s ten day window.

Accordingly, the district court converted Steamship's Rule 59(e) motion into

a Rule 60(b) motion for relief from judgment and considered it along with

---

[2] Rule 59(e) provides: "Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment." Fed. R. Civ. P. 59(e). Rule 60, in turn, provides:

> (a) Clerical Mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected . . . on the motion of any party . . . .

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Fed. R. Civ. P. 60.

Steamship's Rule 60(a) motion to correct a clerical error in the judgment. In its March 16, 2005 order, the district court denied Steamship's motions. Steamship then appealed to this Court on April 12, 2005.

II.

Before reaching the merits of Steamship's appeal, we are obliged to address the Plaintiff Banks' argument that Steamship's untimely notice of appeal deprived us of appellate jurisdiction. "[N]otice of appeal in a civil case must be filed within 30 days from the entry of judgment," and a timely filed notice of appeal is prerequisite to this Court's jurisdiction. See Wright v. Preferred Research, Inc., 891 F.2d 886, 888 (11th Cir. 1990); accord Fed. R. App. P. 4(a)(1)(A). But

> [i]f a party timely files in the district court any of the following motions . . . the time to file an appeal runs for all parties from the entry of the order disposing of the last such remaining motion: . . . (iv) to alter or amend the judgment under Rule 59 . . . or (vi) for relief under Rule 60 if the motion is filed no later than 10 days after the judgment is entered.

Fed. R. App. P. 4(a)(4)(A).

The Plaintiff Banks assert Steamship filed its notice of appeal later than 30 days after entry of judgment. Although they concede that Steamship's original Rule 59 and 60 motions were filed within ten days of the final judgment, which tolled the period for filing a notice of appeal, see id., they contend that Steamship's amended Rule 59 and 60 motions -- filed later than ten days after the district court's judgment --

7

completely supersede the original motions. Thus, they say, filing the amended motions nullified the tolling effect of the original motions, rendering untimely Steamship's notice of appeal, which was filed less than thirty days after the district court's decision on the amended motions, but more than thirty days after final judgment.

Plaintiff Banks thus posit that an amended motion supersedes the original entirely, even as to timeliness and tolling, and cite two cases for that proposition: Pinion v. Dow Chem. U.S.A., 928 F.2d 1522 (11th Cir. 1991), and Young v. City of Mount Ranier, 238 F.3d 567 (4th Cir. 2001). Both are inapposite. In Pinion, a panel of this Court considered whether the district court could extend the deadline for filing original post-trial motions. 928 F.2d at 1532-34. And in Young, the Fourth Circuit considered whether a litigant could challenge the dismissal of claims asserted in the original complaint but not re-alleged in an amended complaint. 238 F.3d at 572. Neither case decided whether an amended Rule 59 or 60 motion destroys the original motion's tolling effect. Instead, this question is controlled by Pate v. Seaboard R.R., Inc., 819 F.2d 1074 (11th Cir. 1987). In Pate, following an adverse judgment, appellants timely filed a Rule 59 motion for new trial, then, seven months later, amended their motion, asserting new grounds. The district court denied the motion. Appellee challenged this Court's jurisdiction and the district court's power to grant

8

a new trial on grounds raised only in the amended Rule 59 motion filed outside the "mandatory and jurisdictional time constraints of Fed. R. Civ. P. 59(b)." Id. at 1083-84. We squarely rejected that argument, reasoning that "[o]nce an effective new trial motion has been made, and the finality of the judgment for purposes of appeal has been thereby suspended, there is no reason for foreclosing amendment of the motion when this would be justified according to the usual standards for permitting amendments." Id. at 1085. Thus, we concluded that "a district court may, in its discretion, allow an amendment to a timely motion for a new trial prior to its decision on the merits of the motion and that the court may consider new grounds raised in the amended motion." Id. at 1084.

Because the ten day period for filing a Rule 59 motion is jurisdictional and cannot be extended, and Pate grants district courts the discretion to consider amendments to timely filed Rule 59 motions, it follows that an amended post-trial motion does not supersede the original for purposes of timeliness or, by extension, tolling. Simply put, Steamship's amended Rule 59 and 60 motions did not affect the tolling of the original, timely-filed motions and thus Steamship's notice of appeal was timely filed. Plainly, we have jurisdiction over the appeal.

III.

Steamship argues that two substantive errors require us to reverse the district

9

court's order. First, the district court erred in denying it recovery for insurance provided to the Voyager <u>after</u> the vessel's arrest. And second, the district court miscalculated the amount of Steamship's lien for insurance provided <u>before</u> the vessel's arrest.

We reject the first argument for two reasons: (1) Steamship is not entitled, under the doctrine of <u>custodia</u> <u>legis</u>, to equitable prioritization of its claim for the value of insurance it provided to the vessel after its arrest because it did not first seek or receive the district court's permission to provide such insurance; and (2) the mere fact that Steamship provided post-arrest insurance pursuant to an ongoing contract does not mean Steamship possessed a unitary lien for the value of pre- and post-arrest insurance, because the vessel's arrest stopped the lien's accrual. We accept Steamship's second argument, however, because it is clear the district court improperly calculated the amount of Steamship's lien by including only the value of insurance Steamship <u>invoiced</u> to OWC before the vessel's arrest. The proper calculation should have included the value of all insurance Steamship <u>provided</u> to the vessel before its arrest, regardless of whether it had yet been invoiced.

A.

As for the first argument, Steamship claims that "the obligation for the entire 2003 P&I Insurance premium arose at the inception of the 2003 policy year, as did

10

the priority FMLA lien, [therefore] the <u>custodia</u> <u>legis</u> doctrine was invalidly invoked

to 'cut off' Steamship's lien for the insurance provided for the 34 days after the arrest."

We disagree.

A maritime lien is "[a] special property right in a ship given to a creditor by law

as security for a debt or claim subsisting from the moment the debt arises[.]"

<u>Galehead, Inc. v. M/V Anglia</u>, 183 F.3d 1242, 1247 (11th Cir. 1999) (alterations in

original) (quoting <u>Black's Law Dictionary</u> 969 (6th ed.1990)). The Maritime

Commercial Instruments and Liens Vessel Identification Act ("Federal Maritime

Liens Act" or "FMLA") provides that "a person providing necessaries to a vessel on

the order of the owner or a person authorized by the owner . . . has a maritime lien on

the vessel." 46 U.S.C. § 31342.[3] Yet, the long established rule in admiralty law is that

"no lien can attach to a vessel while she is in judicial custody." <u>Donald D. Forsht</u>

<u>Assocs., Inc. v. Transamerica ICS, Inc.</u>, 821 F.2d 1556, 1561 (11th Cir. 1987); <u>accord</u>

<u>Oil Shipping (Bunkering) B.V. v. Sonmez Denizcilik Ve Ticaret A.S.</u>, 10 F.3d 176,

178-79 (3d Cir. 1993) ("Since the seizure revokes all authority to incur liabilities on

behalf of the ship, <u>one who renders services without first requiring the Court's</u>

<u>permission, does so at his risk</u>." (emphasis added)). Instead, claims for necessaries

---

[3] In 1989, 46 U.S.C. § 31342 superseded 46 U.S.C. § 971 without working any significant change. Section 971 had used the verb "furnishing" rather than "providing." Neither party has suggested that this change could affect our analysis in any way.

provided to a ship after its arrest "are paid as 'expenses of justice' in priority to all lien claims when the dictates of 'equity and good conscious' so require." Donald D. Forsht Assocs., 821 F.2d at 1561; accord New York Dock Co. v. The Poznan, 274 U.S. 117, 120-21 (1927); Kingstate Oil v. M/V Green Star, 815 F.2d 918, 922 (3d Cir. 1987) ("A person furnishing goods or services to a vessel after its arrest . . . does not acquire a maritime lien against the vessel for the value of those goods or services."); General Elec. Credit & Leasing Corp. v. Drill Ship Mission Exploration, 668 F.2d 811, 815-16 (5th Cir. 1982); Bassis v. Universal Line, S. A., 484 F.2d 1065, 1068 (2d Cir. 1973) ("[T]hose furnishing custodial services to a ship in custodia legis are gambling on a wholly unpredictable result unless they take the precaution of having their services authorized in advance by an order of the custodial court." (internal quotation marks omitted)); Payne v. S.S. Tropic Breeze, 423 F.2d 236, 239 (1st Cir. 1970) ("Expenditures while a ship is in custodia legis do not give rise to maritime liens. . . . [But] a district court, sitting in admiralty, has the equitable power to give priority to [such] claims.").

We review for abuse of discretion a district court's exercise of its equitable power. SEC v. Ginsburg, 362 F.3d 1292, 1297 (11th Cir. 2004) (citing Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1220 (11th Cir. 2002)); see also Associated Metals and Minerals Corp. v. ALEXANDER'S UNITY MV, 41 F.3d

12

1007, 1018 (5th Cir. 1995) (reviewing for abuse of discretion a district court's decision to award priority for expenses incurred in custodia legis); Oil Shipping, 10 F.3d at 181-82 (same).

Here, the district court determined that equity and good conscience counseled against giving priority to Steamship's claims for insurance provided post-arrest. The district court acknowledged the general rule against accrual of liens after arrest and the equitable principle of awarding priority for certain claimants who provide services to a vessel after its arrest. The trial court noted that the Voyager's arrest was actual, rather than nominal, and notice of the arrest was published in various newspapers. Moreover, the Voyager ceased normal operations during its arrest. The district court also found that "Steamship did not apply for, and did not obtain, permission from either this Court or the Bankruptcy court to render insurance services in custodia legis." And, as the district court noted, "it was the responsibility of [the vessel's court appointed custodian] to obtain insurance for the vessel during the period following arrest." Accordingly, the district court declined to exercise its equitable power to grant a priority to Steamship's claims for insurance provided post-arrest.

Steamship argues, however, it possesses a maritime lien for post-arrest insurance because it provided the insurance pursuant to an ongoing contract that began pre-arrest. In such a case, Steamship contends, the vessel's arrest cannot stop

the lien's accrual.

Steamship is right that some courts have held that all performance under an ongoing contract acquires a single attachment date for purposes of according priority among competing liens. But it does not follow that a maritime lien continues to accrue after the vessel's arrest. For example, Steamship cites to Bank One La. N.A. v. Mr. Dean MV, 293 F.3d 830, 832-38 (5th Cir. 2002). There, BargeCarib sued the Mr. Dean asserting a lien for breach of a charter party. Bank One acquired a mortgage against the vessel after BargeCarib's charter began, but before breach of the charter party occurred. Bank One's mortgage claim took priority over all other claims against the vessel except for preferred maritime liens, and BargeCarib's lien for breach of a charter party was preferred only if it arose before the mortgage was filed. The case presented a question of priority among competing liens: whether the lien attached when the charterer took control of the vessel, or whether the lien attached only at the moment of breach. Id. The court held that "[a] maritime lien for breach of a charter . . . attaches when the owner places the vessel at the charterer's disposal and remains inchoate until perfected by a breach or discharged by the undisturbed end of the charter." Id. at 838.

Bank One is uninstructive for several reasons. First, it involved a maritime lien for breach of a charter party, not provision of necessaries, so its discussion of whether

14

the lien arose at the start of performance or at breach is wholly inapposite. A lien for necessaries arises, pursuant to clear statutory language, when the claimant provides necessaries to the vessel. See 46 U.S.C. § 31342. Second, Bank One merely established the date of first performance as the attachment date for a lien arising from breach of an ongoing contract; it said nothing about whether such a lien continues to accrue after a vessel's arrest.

Steamship also relies on Caterpillar Financial Services Inc. v. Aleutian Chalice, 1994 WL 468187, 2-4 (W.D. Wash. Feb. 14, 1994), which is likewise unavailing. There, an insurer contracted with the vessel to provide necessaries (insurance) for one year. Nine days after the policy year began, a financial firm acquired a mortgage against the vessel that took priority over all subsequent maritime liens. The mortgagor argued that the FMLA creates a lien only for necessaries that are actually provided to a vessel, and a year's insurance is provided incrementally rather than in a lump sum. Since the vessel was insured for only nine days before the mortgage attached, the mortgagor contended that the insurer possessed a preferred maritime lien for only nine days' premium; the remainder of the unpaid premium would give rise to a maritime lien, but without priority over the mortgage lien. The district court rejected this argument, holding that insurance is "provided on a continual basis" rather than episodically, and therefore the year-long insurance contract gave rise to

15

a single lien for unpaid premiums with an attachment date of the first day of performance.  Id. at 4-6.  Thus, the entire lien acquired priority over the mortgage because performance began before the mortgage attached. Id.

Caterpillar Financial, Bank One, and the other cases Steamship cites, however, stand merely for a rule of priority ranking: ongoing performance under a single contract gives rise to a single lien, and the first day of performance establishes the lien's attachment date for priority ranking purposes.  Those cases have nothing to say about whether the quantum of a maritime lien for unpaid insurance, having attached at the outset of the policy period, continues to accrue after the vessel's arrest.

Steamship has failed to cite any authority (and we can find none) establishing that ongoing contracts present an exception to the general rule that providing post-arrest necessaries creates no lien.   In other contexts, such as the collection of seamen's wages, we have applied the custodia legis doctrine to cut short the accrual of a maritime lien. See, e.g., The Astoria v. Anglo-American S.S. Agencies, Inc., 281 F. 618, 622 (5th Cir. 1922).[4]  Moreover, the exception Steamship advocates would be contrary to the doctrine's underlying policy: controlling custodial expenses and preserving the res for valid lienholders.  See  The Poznan, 274 U.S. at 122 (priority

---

[4] The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered before October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

should be accorded to claims for post-arrest expenses only where the expense is "for the common benefit and which, in equity and good conscience, should be satisfied before the libelants may enjoy the fruits of their liens"); Pyne v. Oil Screw Fishing Vessel Chrisway, 298 F. Supp. 1160, 1162 (D. Ga. 1969) ("Admiralty courts must maintain some sort of control over custodial expenses . . . which are incurred in the protection of property while in the Marshal's custody. They cannot be determined or measured by the voluntary action of parties at interest and the latter act at their risk in the absence of express authorization.").

Thus, we hold that Steamship's continued provision of insurance after the Voyager's arrest did not give rise to a lien. Moreover, since Steamship concedes that it provided post-arrest insurance without seeking the court's imprimatur and no other piece of evidence establishes that the equities somehow favor Steamship, we are fully satisfied that the district court acted well within its discretion by declining to award Steamship a priority claim for provision of post-arrest insurance.

B.

As for the amount of its lien for insurance provided pre-arrest, Steamship argues that the district court erred by calculating the quantum of its maritime lien as the sum of premiums invoiced pre-arrest, rather than the total amount of insurance provided pre-arrest. We agree.

17

In its Findings of Fact and Conclusions of Law, the district court held that "[b]ecause insurance is essential to keep a vessel in commerce, insurance is a 'necessary' and unpaid premiums give rise to a maritime lien under the FMLA. . . . [A]ll elements of the FMLA are satisfied and Steamship holds a maritime lien." The district court noted that "Steamship witness Jonathan Andrews testified that $61,186.15 is the correct amount owed by the Vessel at the time of arrest," and without further explanation concluded that "Steamship's total preferred maritime lien is $61,186.15."

We review a district court's factual findings for clear error, and the application of law to those facts de novo. Lykes Bros., Inc. v. U.S. Army Corps of Engineers, 64 F.3d 630, 634 (11th Cir. 1995); United States v. Harrell, 926 F.2d 1036, 1039 (11th Cir. 1991). "For a factual finding to be clearly erroneous, this court, after reviewing all of the evidence, must be 'left with the definite and firm conviction that a mistake has been committed.'" Lykes Bros., 64 F.3d at 634 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

The evidence at trial clearly established that the Voyager owed Steamship unpaid premiums for pre-arrest insurance. Steamship presented a corporate representative, Mr. Andrews, who testified as to the billing arrangement by which member ships' yearly premiums came due:

18

Q: And are you familiar with how the premiums were assessed or debited for this ROC fleet entries for 2003/2004 year?

A: Yes, they were debited in six installments, four of which were debited within the policy year, two of which were debited in the subsequent two years. So there is a very long lead time into the payment of the full hundred percent premium.

Q: Given that it is -- that there are two debited premiums outside the policy year, what occurs if a member decides not to renew the policy for the following year?

A: Well, they are brought forward so as to insurer [sic] that the owner that is leaving the club doesn't leave an outstanding debt that would have to be made up by the members of the club that remain.

Steamship followed the same pattern of billing in the preceding years as well. This meant that at the end of a policy year, the vessel would still owe <u>two</u> of six premium payments. As Mr. Andrews testified: "because of the installment program that the club operates, there will be premiums debited for payments in relation to [the 2002 and 2003] policy years, as I described earlier, that would fall due for payment in the next two calendar years." Indeed, after the end of the 2003 policy year, when OWC did not renew insurance on the Voyager, Steamship brought forward all premium payments owing for policy years 2001-2003.

The evidence adduced at trial is clear and uncontradicted that on the date of the vessel's arrest, Steamship had provided insurance coverage to the vessel for which Steamship received no payment. The evidence also clearly established that, while

19

$61,186.15 was the amount currently <u>due</u> when the vessel was arrested, Steamship had provided insurance to the vessel that had not come due before the vessel's arrest. Thus, OWC actually <u>owed</u> a larger sum in unpaid premiums.[5]

Nevertheless, the district court held that Steamship's lien equaled only $61,186.15. In reaching this conclusion, the district court apparently made the legal determination that Steamship's maritime lien was limited to premiums invoiced before the Voyager's arrest. This was error. The FMLA provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." 46 U.S.C. § 31342. The statute's language states clearly that one acquires a maritime lien by "<u>providing</u> necessaries to a vessel," <u>id.</u> (emphasis added), not by issuing an invoice. Thus, the federal courts have consistently held that a maritime lien arises when the necessary is <u>provided</u> to the

---

[5] Mr. Andrews' testimony on cross-examination, on which the district court relied in calculating the quantum of Steamship's lien, established that $61,186.15 was the amount of premiums due or past due when the Voyager was arrested. Moreover, Mr. Andrews' testified this way regarding a letter from Steamship to OWC, dated December 23, 2003:

> Q: If you look at the last sentence of the first paragraph [of the December 23, 2003 letter], quote, "The <u>present</u> P&I Mutual Premium <u>due</u> on the . . . Voyager is dollar six one comma one eight six point one five <u>with further amounts likely to be debited in course</u>," end quote. Do you know if that was an accurate statement at the time this document was sent?
>
> A: I believe it is accurate, yes.

(emphasis added).

20

vessel. See, e.g., Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12-13 (1920) (explaining that a maritime lien arises immediately and secretly when necessaries are provided to the vessel); Container Applications Int'l, Inc. v. Lykes Bros. Steamship Co., (In Re Container Applications Int'l., Inc.), 233 F.3d 1361, 1362, 1366 (11th Cir. 2000) (explaining that a maritime lien claimant must have: (1) provided (2) necessaries (3) to a vessel, (4) by order of the owner or an authorized agent); Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd., 808 F.2d 697, 699 (9th Cir. 1987) (same); Riffe Petroleum Co. v. Cibro Sales Corp., 601 F.2d 1385, 1389 (10th Cir. 1979) (Under the FMLA, a "lien arises automatically upon the furnishing of necessaries"); P.R. Ports Auth. v. BARGE KATY-B, 427 F.3d 93, 103 (1st Cir. 2005) (same); Thomas J. Schoenbaum, 1 Admiralty and Maritime Law 525 (4th ed. 2004) (same).

In view of this well-established principle of law, the district court's judgment to the contrary is plainly wrong. Steamship possessed a maritime lien for the insurance it provided before the vessel's arrest, the timing of invoices notwithstanding. The amount of Steamship's lien should equal the total value of insurance Steamship provided to the vessel before its arrest. Accordingly, we are required to vacate the district court's judgment as to Steamship, and remand for further proceedings to re-calculate the amount of Steamship's lien in light of the

principles set forth herein.[6]

VACATED AND REMANDED.

---

[6] Steamship also argues that the district court erred by denying as untimely Steamship's Rule 59 motion to amend the judgment. But since we have vacated the district court's judgment, Steamship's appeal from denial of its Rule 59 motion is moot. See, e.g., Urfirer v. Cornfeld, 408 F.3d 710, 712 (11th Cir. 2005).