[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-11288

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 12, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-00334-CV-WS

CRIMSON YACHTS,
an unincorporated division of Horizon
Shipbuilding, Inc., an Alabama corporation,

Plaintiff-Appellant,

versus

BETTY LYN II MOTOR YACHT,
Official No. 55036, in rem,
BLYN II HOLDING, LLC,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(April 12, 2010)

Before BLACK, MARCUS and HIGGINBOTHAM,[*] Circuit Judges.

BLACK, Circuit Judge:

_____

[*]Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Appellant, shipyard Crimson Yachts, seeks to enforce a maritime lien for major repairs it performed on a motor yacht, Appellee the Betty Lyn II. Crimson Yachts claims the yacht's owner, Appellee Blyn II Holding, LLC (Blyn), failed to make full payment for the repairs. Crimson Yachts sued the Betty Lyn II *in rem*, and sued BLyn *in personam*, to recover the remainder of the debt. Pursuant to Appellees' joint motion, the district court dismissed the *in rem* claims against the Betty Lyn II and vacated its arrest. The district court found the Betty Lyn II was not a "vessel" subject to maritime liens. Because the maritime lien was a prerequisite to the court's admiralty jurisdiction, the court concluded it lacked jurisdiction over the *in rem* proceeding against the Betty Lyn II. The issue we resolve on appeal is whether the Betty Lyn II is a vessel and, therefore, subject to maritime liens and the court's admiralty jurisdiction. We conclude that she is and reverse and remand for further proceedings.

## I. BACKGROUND

The Betty Lyn II is a 132-foot yacht built in 1974. In 2006, the parties agreed to have Crimson Yachts perform a major overhaul on the Betty Lyn II to include, *inter alia*, extension of its decks and replacement of its engines, generators, electronics, navigation equipment, plumbing, and wiring. The original estimated duration of the repair was 15 months. After the parties agreed

2

to the repairs, the Betty Lyn II's engines, propellers, propeller shafts, generators, and most of its furniture and equipment were removed, and it was towed to Crimson Yachts's shipyard in Alabama. Crimson Yachts began work on the Betty Lyn II around October 1, 2006. The repairs required Crimson Yachts to remove the Betty Lyn II from the water with cranes and place her on a cradle in a covered shed. The work and the corresponding payments continued for a year and a half. Then, in March 2008, BLyn allegedly ceased payment for the repairs. Crimson Yachts claims the amount in unpaid invoices currently exceeds $1,200,000.

Crimson Yachts filed suit on June 11, 2008. The Appellees jointly filed a motion to vacate the arrest of, and to dismiss the *in rem* claims against, the Betty Lyn II for lack of admiralty jurisdiction. The district court held a motion hearing on October 29, 2008 at which the court heard testimony about the overhaul and condition of the Betty Lyn II.[1] On February 26, 2009, the district court issued an order concluding that a ship must be "in navigation" to be a "vessel," and finding the major overhaul of the Betty Lyn II had taken the yacht out of navigation,

---

[1]"[W]hether maritime jurisdiction exists is a question anterior to, although often coincident with, the question of whether the plaintiff has a maritime lien." *Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir. 1998). As in *Armour & Co. v. Fort Morgan S.S. Co.*, 270 U.S. 253, 46 S. Ct. 212 (1926), this "case is not of that class where the existence of jurisdiction is conclusively determined by the first pleading of him who institutes the suit," but rather requires us to "consider whether the facts developed after the filing . . . preclude the exercise of admiralty jurisdiction." *Id.*, 270 U.S. at 258–59, 46 S. Ct. at 214.

3

thereby divesting her of her status as a vessel. The district court dismissed the *in rem* claims against the Betty Lyn II and vacated her arrest. This timely interlocutory appeal followed.

## II. STANDARD OF REVIEW

The Constitution empowers the federal judiciary to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III § 2, cl. 2. Congress, in accordance with Article III, vested in federal district courts "original and exclusive jurisdiction over 'any case of admiralty or maritime jurisdiction.'" *Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 348 (11th Cir. 1994) (quoting 28 U.S.C. § 1333(1)). This Court reviews *de novo* the district court's dismissal for lack of admiralty jurisdiction. *Bd. Of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1305 (11th Cir. 2008).

## III. DISCUSSION

An *in rem* admiralty proceeding requires as its basis a maritime lien. *The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215 (1867). "A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim," and it attaches "the moment the debt arises." *Dresdner Bank AG v. M/V Olympia Voyager*, 465 F.3d 1267, 1272 (11th Cir. 2006) (citing *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1247 (11th Cir. 1999) (quotations omitted).

4

Maritime liens differ from other common law liens in that a maritime lien is "not simply a security device to be foreclosed if the owner defaults"; rather, a maritime lien converts the vessel itself into the obligor and allows injured parties to proceed against it directly. *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 908–09 (4th Cir. 1981). This is called an *in rem* proceeding. "An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts." *Belle of Orleans*, 535 F.3d at 1314 (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 446–47, 114 S. Ct. 981, 985 (1994)).

Federal district courts obtain *in rem* jurisdiction over a vessel when a maritime lien attaches to it. *Industria Nacional Del Papel, CA. v. M/V Albert F*, 730 F.2d 622, 625 (11th Cir. 1984). Upon filing an *in rem* complaint, the clerk of court issues a warrant for the arrest of the *res. See Merchs. Nat'l Bank v. Dredge Gen. G.L. Gillespie*, 663 F.2d 1338, 1340 n.1 (5th Cir. 1981) (quoting Fed. R. Civ. P., Supplemental Rules for Certain Admiralty and Maritime Claims (Rule C)). The *res* remains in the court's custody during the proceeding as serves as both the respondent and the subject matter. *See* 2 Benedict on Admiralty § 21 at 2-6 to 2-8 (7th ed. rev. 1998).

The Federal Maritime Lien Act, 46 U.S.C. §§ 31341–31343, grants maritime liens to particular persons based on their relationship to, or service of, a

vessel.  For example, the Act grants a maritime lien to "a person providing necessaries to a vessel."  *See id.* § 31342(a).  The Act then grants maritime lienholders the right to "bring a civil action *in rem* to enforce the lien."  *Id.*  In other words, "[a] maritime lien gives to its holder a property right in a vessel, and the proceeding in rem is . . . a means of enforcing the property right."  *See Merchs. Nat'l Bank*, 663 F.2d at 1346.  A maritime lien cannot be executed or divested outside of an *in rem* proceeding.  *Vandewater v. Mills*, 60 U.S. 82, 89 (1856).

Crimson Yachts claims that its repair work on the Betty Lyn II entitles it to a maritime lien.  Crimson Yachts sought to enforce this lien by filing *in rem* claims against the Betty Lyn II and causing the court to effect her arrest.  Appellees claim Crimson Yachts's work on the Betty Lyn II did not result in a maritime lien, because the yacht is not a "vessel" according to maritime law, and thus is not subject to maritime liens.  The issue, then, is whether the Betty Lyn II is a "vessel" subject to maritime liens and the court's jurisdiction, or whether the extensive and time-consuming nature of the repairs divested the Betty Lyn II of her vessel status, thereby making her ineligible for a maritime lien and depriving the district court of admiralty jurisdiction over the *in rem* claims in this case.

*A. The Purpose of Maritime Liens*

In resolving whether the district court's admiralty jurisdiction encompasses the claims against the Betty Lyn II, we review the purpose, origin, and development of maritime liens. "The maritime lien developed as a necessary incident of the operation of vessels." *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 8, 41 S. Ct. 1, 3 (1920) (elaborating on the intent behind § 31342(a)'s predecessor statute, the Act of June 23). Maritime liens have special features designed to protect persons who own, sail, and service ships from the unique risks associated with the shipping industry.

Maritime liens originated, in part, "in a desire to protect the ship," which is "peculiarly subject to vicssitudes which would compel abandonment . . . unless repairs and supplies were promptly furnished." *Id.* at 9, 41 S. Ct. at 3. Ships braved the danger of the seas dependent on a solid construction and a skillful crew. Should structure or seaman fail, ships had little to compensate for the loss and, at times, had to seek the help of strangers. Ships, however, often lacked items of sufficient value to offer in exchange for the help they needed.

Because a ship was often in need of repairs and necessaries while it was away from its home port and without large sums of money on board, maritime liens enabled persons in charge of the ship to use the value of the vessel itself as a

pledge of credit in order to secure the work and parts it needed during the voyage. *Id.*; *see also Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974) ("The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment.");[2] *The Alligator*, 161 F. 37, 40 (3d Cir. 1908) (explaining maritime liens facilitate commerce by encouraging merchants to furnish ships with supplies and repairs); 2 Benedict on Admiralty § 21 at 2-1 (7th ed. rev. 1998). "Moneys are not usually loaned to strangers, residents of distant and foreign countries, without security, and it would be a violent presumption to suppose that any such course was adopted when ample security in the vessel was lying before the parties." *Wilkins v. Commercial Inv. Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir. 1998) (citing *The Emily Souder*, 84 U.S. (17 Wall.) 666, 671 (1873)).

Maritime liens could attach "even if the vessel owner ha[d] not personally contracted" for the services performed. *S.E.L. Maduro (Fla.), Inc. v. M/V Antonio de Gastaneta*, 833 F.2d 1477, 1482 (11th Cir. 1987); *see also* 46 U.S.C. § 31341(a). This feature, too, addressed the unique needs of ships sailing far away from their home ports.

---

[2]The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1207, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

In addition to the unique nature of maritime liens, the maritime-lien priority system facilitated a ship's ability to offer something of value in exchange for what it needed. Maritime liens have priority over non-maritime liens and priority over other maritime liens in reverse chronological order: that is, the most recent lien possesses the superior claim. *The Emily Souder*, 84 U.S. at 672; *The St. Jago de Cuba,* 22 U.S. (9 Wheat.) 409, 416 (1824); *see also* 2 Benedict on Admiralty § 51 at 4-1 to 4-4 (7th ed. rev. 1998). This is because "[i]f liens created by the necessities of vessels in a foreign port could be subordinated to or displaced by mortgages to prior creditors at home, such liens would soon cease to be regarded as . . . affording any reliable security." *The Emily Souder*, 84 U.S. at 672. This reverse-chronology priority system does no disservice to earlier claimants because, as with funds, when services are "[a]dvanced for the security and protection of the vessel, they . . . benefit . . . the mortgagees as well as . . . the owners." *See id.* Most importantly, the priority system encourages repairmen to service the ships of strangers without knowing anything of the ship's prior credit history. These special features facilitate ships' ability to contract with persons able to supply and repair them, wherever ships might find themselves.[3]

---

[3]Also influencing the development of maritime liens may have been the historical concept of a vessel as a person with independent liability. *See Detroit Trust Co. v. Barlum S.S. Co.*, 293 U.S. 21, 48, 55 S. Ct. 31, 40 (1934) ("The ship from the moment her keel touches the water . . . acquires personality; she becomes competent to contract, is individually liable for her

Maritime liens have additional qualities specially designed to protect those furnishing ships with repairs and supplies. For instance, maritime liens protect repairmen and suppliers from clients who might be tempted to sail their vessels away after services are rendered. *See Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir.1986) (en banc) ("The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away."); *see also Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 919 (9th Cir. 2002). Maritime liens allow injured parties, such as unpaid repairers or suppliers, to "obtain redress . . . without seeking compensation abroad from the vessel's owner," enabling them to proceed directly against the vessel *in rem*. *See Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904, 909 (4th Cir. 1981). The liens vest in "creditors who provide supplies which are necessary to keep the ship going. . . . the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Silver Star Enters., Inc. v. Saramacca MV*, 82 F.3d 666, 668 (5th Cir. 1996) (quoting

---

obligations, and is responsible for her torts.") (quotations omitted)*; see also Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986) (en banc), *cert. denied*, 479 U.S. 984, 107 S. Ct. 570 (1986) ("The maritime lien concept thus somewhat personifies a vessel as an entity with potential liabilities independent and apart from the personal liability of its owner.")*; Merchs. Nat'l Bank*, 663 F.2d at 1345 ("The maritime lien has at its basis, to a substantial extent, the historical and theoretical concept of personification . . . ."); 2 Benedict on Admiralty § 21 at 2-2 (7th ed. Rev. 1998).

*Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co.*, 310 U.S. 268, 280, 60 S. Ct. 937, 943 (1940) and *Equilease*, 793 F.2d at 602).

The adhesive nature of maritime liens provides additional protection to repairmen and suppliers. Unlike mechanics' and materialmen's liens, maritime liens do not depend on the injured party's possession of the vessel; a maritime lien travels with the vessel wherever it goes, regardless of into whose hands it may pass, whether or not the lien is recorded. *Vandewater*, 60 U.S. at 89 (1856) (describing a maritime lien as a "secret" right of the lienholder in the property even when he is "without actual possession or any right of possession," and acknowledging the lien remains with the vessel, even surviving its purchase by a bona fide buyer); *Equilease*, 793 F.2d at 602.

Thus, maritime liens benefit those who own, lend to, and repair vessels, such that persons able to provide for ships' immediate needs are assured a significant, clear, and predictable security device that is tailored to the unique features of maritime commerce.

## B. A Brief History of Maritime Lien Legislation

It is not surprising that, given the historical nature and special needs of the shipping industry, maritime lien laws are no recent development. Maritime liens existed in Continental Europe and first emerged in the United States through state

11

and common law. *See* 2 Benedict on Admiralty §§ 36–37 at 3-21 to 3-22; § 41, at 3-44 (7th ed. rev. 1998). This decentralized development of the lien laws resulted in a "confusing collection of individual statutes enacted over . . . centuries—each enacted to solve some particular problem of the day." *See* H. R. REP. NO. 100-918, at 11 (1988). The statutes were "poorly organized, duplicative, often obsolete, and difficult to understand and apply." *Id.*

The competing legal regimes governing maritime liens were further complicated by geographical variance. Different locations had different rules governing whether liens could attach, depending on, for example, a ship's origin and port of service. *See* H. R. REP. NO. 46-1698 at 1–3 (1880). The laws also differed as to when during the repair process a lien could attach. *Id.* Congress recognized the need to unify and simplify the law. *See The Gertrude v. Coward*, 38 F.2d 946, 948 (5th Cir. 1930) (noting one of the purposes of the Act of June 23, 1910 was to replace state maritime-lien statutes with a single, national law).

In 1910, Congress passed the first version of the Federal Maritime Lien Act, establishing a uniform national maritime lien system. *See id*; Act of June 23, 1910, ch. 373 § 1, 36 Stat. 604 (current version at 46 U.S.C. § 31342(a)). The Act of June 23, 1910 stated:

> Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or

domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.

In enacting the statute, Congress did not intend to "change the general principles of the law of maritime liens"; instead, Congress meant "to simplify and clarify the rules [governing] maritime liens as to which there had been much confusion," to eliminate "artificial distinction[s]," and to "substitute[] a federal statute for numerous state statutes." *Dampskibsselskabet Dannebrog*, 310 U.S. at 271–72, 60 S. Ct. at 939–40; *Equilease*, 793 F.2d at 602–03 (noting prior to the Act there was "a discrepancy . . . as to when and under what circumstances" a maritime lien would apply and noting that with the enactment of the law, "a single federal statute is substituted for the state statutes . . . and the old geographical distinctions are gone").

The first national law laid a solid foundation for creating a comprehensible and user-friendly lien system, but it did not totally eliminate the confusion surrounding maritime liens. As a result, the Act was amended over time for the purpose of further simplifying and clarifying the lien system. *See, e.g.*, H. R. REP. No. 100-918, at 11 (1988). The most recent version of the law was enacted in 1989, when 46 U.S.C. § 31342 superseded an amended version of the original Act

13

"without significant change." *In re Container Applications Int'l, Inc.*, 233 F.3d 1361, 1363 n.2 (11th Cir. 2000).

Like its predecessors, Congress passed the current version of the Federal Maritime Lien Act to resolve misunderstandings that had developed about the meaning of the Act; Congress did not intend to effect any dramatic substantive change. *Dresdner Bank*, 465 F.3d at 1272 n.3; *Silver Star Enters.*, 82 F.3d at 668 n.2; H. R. REP. NO. 100-918, at 15 (1988). In enacting the current statute, Congress sought to eliminate any confusion surrounding the meaning of the law and intended that "the literal language of the statute [w]ould control the disposition of the cases" interpreting it. H. R. REP. NO. 100-918, at 16 (1988).

C. *"Vessel" Status as a Prerequisite to Attaching a Maritime Lien*

Notably, in each iteration of the Federal Maritime Lien Act, the statutory language specifies that only repairs performed on a "vessel" generate a maritime lien. Thus, a ship's characterization as a "vessel" is a mandatory prerequisite to the attachment of a maritime lien. Because a district court's authority to arrest a ship and to adjudicate an *in rem* proceeding against it requires the attachment of a maritime lien, both the lien and the district court's jurisdiction depend on a ship's status as a "vessel."

14

Title 1 U.S.C. § 3 provides the default definition of "vessel" for the entire United States Code. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 490, 125 S. Ct. 1118, 1124 (2005). "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. This case hinges on whether the Betty Lyn II falls within that description. If the Betty Lyn II is not capable of being used for water transportation, Crimson Yachts cannot possibly have a maritime lien for the repairs it performed on her, and the district court would, therefore, have no admiralty jurisdiction to adjudicate the *in rem* claims.

In deciding whether a watercraft is a vessel, "the focus . . . is the craft's capability, not its present use or station." *Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1310 (11th Cir. 2008). The dispositive question is "whether the watercraft's use as a means of transportation on water is a practical possibility or merely a theoretical one." *Id.* (quoting *Stewart*, 543 U.S. at 496, 125 S. Ct. at 1118) (quotation marks omitted); *Cain v. Transocean Offshore USA, Inc.*, 518 F.3d 295, 300 (5th Cir. 2008); *see also Holmes v. Atlanta Sounding Co.,* 437 F.3d 441, 448 (5th Cir. 2006) ("Under § 3, a 'vessel' is *any* watercraft practically capable of *maritime transportation*,

regardless of its primary purpose or state of transit at a particular moment." (quotations omitted)).

Shortly after the passage of the original federal maritime lien statute, the Supreme Court expounded on which ships qualify as vessels for the purpose of admiralty jurisdiction. *See N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 29 S. Ct. 221 (1919). The Supreme Court made clear that a ship towed into port for extensive repairs may remain a vessel subject to admiralty jurisdiction during the overhaul. The steamship in question in *Hall Brothers* "had been wrecked, and had remained submerged for a long time; ice floes had torn away the upper decks, and some of her bottom plates also needed to be replaced." *Id.* at 123, 29 S. Ct. at 222. Like the Betty Lyn II, the ship in *Hall Brothers* was towed to a ship yard and then placed in drydock to undergo extensive repairs—in that case, to ready the ship for an Alaskan voyage. *Id.* The Supreme Court held that the steamship, despite its dilapidated state and extensive overhaul, remained subject to admiralty jurisdiction during the repair period. *Id.* at 129, 29 S. Ct. at 224.

The former Fifth Circuit, too, provided early guidance as to which ships were vessels subject to maritime liens. *See Pleason v. Gulfport Shipbuilding Corp.*, 221 F.2d 621 (5th Cir. 1955). In *Pleason*, the plaintiffs sought to enforce a

16

maritime lien on the steamship the Carol Ann for work done converting the ship into a shrimp processing, freezing, and storage plant. *Id.* at 622–23. The defendants argued the Carol Ann was not a "vessel" under maritime law. *Id.* at 622. When the Carol Ann was brought in for repairs, she had been gutted and had to be towed, much like the Betty Lyn II in this case. *Id.* at 622–23. The Carol Ann had no propellers, propeller shafts, crew, working machinery, light, heat, power, engines, or steering apparatuses when she was brought in for repairs. *Id.* Although she regained her own power system, the repairs left the Carol Ann without motive or steering power and moored to a dock by steel cables with her telephone and electric lines connected to the land. *Id.* at 623.

The Carol Ann was afloat, had a superstructure, masts, decks, and cabins and was capable of being towed both before and after the repairs. *Id.* Thus, the *Pleason* Court held that the steamship was a vessel, emphasizing she was "*capable of being used as a means of water transportation.*" *Id.* *Pleason,* like *Hall Brothers*, suggests the Betty Lyn II is a vessel despite undergoing a massive overhaul, because she maintained her structure and was capable of being towed both prior and subsequent to the repairs at issue.

In *Belle of Orleans*, this Circuit, guided in part by *Pleason*, held that a gambling boat that broke free during Hurricane Katrina, severely damaging itself

17

and a marina, was a vessel for purposes of admiralty jurisdiction, even though it had steel cables mooring her to the shore and her electric, computer, sewage, and phone systems were linked to land. 535 F.3d at 1307, 1316. As the Belle of Orleans maintained a captain, a crew, a deck, a superstructure, cabins, engines, and generators, and was afloat and capable of being towed in for repairs, this Circuit held it satisfied the requirements of 1 U.S.C. § 3. *Id.* at 1312.

The *Belle of Orleans* Court distinguished between vessels that are "temporarily stationed in a particular location" and non-vessels "*permanently* affixed to shore or resting on the ocean floor." *Id.* at 1310 (quoting *Stewart*, 543 U.S. at 493–94, 125 S. Ct. At 1127) (emphasis added).[4] This dichotomy is useful in examining the Betty Lyn II. Despite her "state of transit at [the] particular moment," *see Stewart*, 543 U.S. at 427, 125 S. Ct. at 1129, the Betty Lyn II had been towed in for repairs, maintained her structure during the overhaul, and could have been put in the water and towed within 24 hours. She was not permanently affixed to land or to the bottom of the ocean in a manner that sapped her practical

---

[4]Ships rendered permanently incapable of maritime transportation are "dead ships" ineligible for maritime liens. *See Amoco Oil v. M/V Montclair*, 766 F.2d 473, 477 (11th Cir. 1985) ("A'vessel' is subject to a maritime lien. A 'dead ship' is not."); *see also Colonna's Shipyard, Inc. v. U.S.A.F. Gen. Hoyt S. Vandenberg*, 584 F. Supp. 2d 862, 867 (E.D. Va. 2008) ("A key element in determining whether a watercraft that was indisputably a vessel at some point in the past is now a 'dead ship' is whether such watercraft is *permanently* withdrawn from navigation.") (citing *Hercules Co. v. The Brigadier Gen. Absolom Baird*, 214 F.2d 66, 68 (3d Cir. 1954)).

capacity to serve as a mode of transportation on water.  *Belle of Orleans*, therefore,

suggests the Betty Lyn II retained her vessel status during the repair period.

*Belle of Orleans* also relied, in part, on the Supreme Court decision in

*Stewart v. Dutra Construction Co. See Belle of Orleans*, 535 F.3d at 1306,

1309–12.   In *Stewart*, the Supreme Court decided whether a person injured while

working on a dredge called the Super Scoop could recover worker's compensation

under the Jones Act, an act that protects only seamen.[5]  543 U.S. at 485–86, 125 S.

Ct. at 1122–23. The *Stewart* Court analyzed the term "vessel in navigation,"

because "the key to seaman status is employment-related connection to a vessel in

navigation," *Chandris*, *Inc. v. Latsis*, 515 U.S. 347, 357, 115 S. Ct. 2172, 2184

(1995) (quotations omitted).  The *Stewart* Court held that, although it was idle,

with one scow at sea and the other without a working engine, the Super Scoop was

a vessel in navigation because it "had not been taken out of service, permanently

anchored, or otherwise rendered practically incapable of maritime transport." 543

U.S. at 496, 125 S. Ct. at 1128.  The Court stated that in determining whether a

---

[5]The Jones Act was born from Congress' recognition of the greater perils of a life at sea and provides more extensive worker's compensation recovery for seamen than that available to land-based workers under the Longshore and Harbor Workers' Compensation Act (LHWCA). *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354–56, 368, 370, 115 S. Ct. 2172, 2183–84, 2190 (1995); *see Bainbridge v. Merchants'. & Miners' Transp. Co.*, 287 U.S. 278, 282, 53 S. Ct. 159, 160 (1932) ("Seamen have always been regarded as wards of the admiralty, and their rights, wrongs, and injuries a special subject of the admiralty jurisdiction. The policy of Congress, as evidenced by its legislation, has been to deal with them as a favored class." (citations omitted)).

19

watercraft constitutes a "vessel" under § 3, "[t]he question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id.* (citation omitted).

The district court relied on *Stewart* for the proposition that a watercraft taken out of navigation is no longer a vessel. *Stewart* does mention that a ship's navigational status is "relevant" to whether it is practically capable of transportation on water. 543 U.S. at 496, 125 S. Ct. at 1128. The Court does not, however, *require* that a ship be "in navigation" to be considered a "vessel" for purposes of 1 U.S.C. § 3.[6]

As we have discussed, *Stewart* decided whether a worker on a floating dredge was a seaman. *Stewart* did not decide whether a ship taken out of the water for extensive repairs was a vessel. *Stewart's* holding, thus, does not decide the issue before us. Rather, we must decide this case by looking at its distinct factual circumstances and their legal implications. *Nehring v. S.S. M/V Point Vail*, 901 F.2d 1044, 1050 (11th Cir. 1990). *Stewart* simply reinforces our precedent,

---

[6]Benedict on Admiralty succinctly states the conclusion compelled by precedent and a review of the intent behind the maritime lien system: "[T]here is no reason why a vessel which has been withdrawn from navigation but which is still technically capable of being used in navigation should escape the provisions of the [Federal Maritime Lien Act]. 2 Benedict on Admiralty §§ 38 at 3-26 (7th ed. rev. 1998).

directing our focus to the Betty Lyn II's *practical capability* to serve as a means of maritime transportation.

### D. The Betty Lyn II is a Vessel

A "case-by-case approach" is often necessary to determine whether admiralty jurisdiction applies to "novel or unusual situations." *Id.* This case warrants such an approach. Our long line of precedent demonstrates that despite her massive overhaul, the Betty Lyn II maintained her vessel status during the repair period. Neither the manner of her repair, nor the fact that the needed repairs were so extensive as to temporarily disable her, divested her of her status as a vessel. Indeed our review of the history of maritime liens demonstrates they were designed to *encourage* repairs on ships in great need. *See supra* Section III.A.

The Betty Lyn II need merely be capable of transportation on water to be a vessel. The law does not require that she be able to self-propel. *See Belle of Orleans*, 535 F.3d at 1307 (noting the "vessel" had to be towed in for repairs); *Miami River Boat Yard, Inc. v. 60' Houseboat*, 390 F.2d 596, 597 (5th Cir. 1968) (holding that a houseboat is "a vessel capable of being subject to a maritime lien," as the fact that "she has no motive power and must . . . be towed does not deprive her of the status of a vessel"); *see also United States v. Templeton*, 378 F.3d 845, 850–51 (8th Cir. 2004) (holding that a ship with inoperable engines and no ability

21

to self-propel was a "vessel" because it had *residual* navigational capacity); *Colonna's Shipyard*, 584 F. Supp. 2d at 864, 872–73 (holding that a ship whose powers of self-navigation were practically irreparable and that was towed to a repair facility to be converted into an artificial reef was a vessel subject to maritime liens because it could be towed and carry a crew and cargo).  In fact, it is instructive that, in addition to "repairs,"  the "necessaries" for which maritime liens are authorized under the Federal Maritime Lien Act specifically include towage. *See* 46 U.S.C. § 31301(4).  Although she could not self-propel, the Betty Lyn II could be towed upon 24 hours notice.

Nor does the fact that the Betty Lyn II was drydocked for the repairs divest her of vessel status.  *See N. Pac. S.S. Co.*, 249 U.S. at 128, 39 S. Ct. at 224 (holding that admiralty jurisdiction extended to an action for ship repairs performed in drydock, because "there is no difference in character as to repairs made upon the hull of a vessel dependent upon whether they are made while she is afloat, while in dry dock, or while hauled up by ways upon land.  The nature of the service is identical in the several cases, and the admiralty jurisdiction extends to all."); *Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht*, 625 F.2d 44, 47 n.2. (5th Cir. 1980) (holding that a yacht that had been test-sailed but was placed in drydock afterward did not lose its status as a vessel merely by being drydocked).  In fact,

22

"all serious repairs upon the hulls of vessels are made in dry docks," so the "error" of exempting ships in drydock from admiralty jurisdiction would "deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs." *Simmons v. The S.S. Jefferson*, 215 U.S. 130, 143, 30 S. Ct. 54, 58 (1909).

Neither is the extensiveness of the Betty Lyn II's overhaul so great as to virtually transform the repair work into new-ship construction, which would not be subject to admiralty jurisdiction. *See New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96, 100, 42 S. Ct. 243, 244 (1922). "[I]f any considerable part of the hull and skeleton of an old vessel in its intact condition, without being broken up, is built upon, the law holds that in such a case it is the old vessel rebuilt, and not a new vessel." *Id.*

The district court held that, because the repairs Crimson Yachts performed on the Betty Lyn II were so extensive and time consuming, the Betty Lyn II lost her status as a vessel during the course of the overhaul and, thus, Crimson Yachts lost any security for its labor in the form of a maritime lien. That holding is mistaken. Congress created maritime liens to protect both ships in need of service and persons willing to provide such services. Congress could not have intended as the

need for protection increased, the law's protection would retract. Thus, the maritime-lien system surely applies in scenarios such as this.

## IV. CONCLUSION

Based on the facts before us, we conclude the Betty Lyn II retained a practical ability to engage in maritime transport and is, therefore, a vessel subject to maritime liens and the district court's admiralty jurisdiction. Accordingly, we reverse the district court's ruling and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**