[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 21-11336

Non-Argument Calendar

————————————

AMERICAN MARINE TECH, INC.,

Plaintiff-Counter Defendant-Appellee,

*versus*

WORLD GROUP YACHTING, INC., in personam,
M/Y ALCHEMIST, a 1995 105 Mangusta recreational vessel, her
boats, engines, generators, tackle, rigging, apparel, furniture, fur-
nishings, equipment, contents and appurtenances, etc., in rem,

Defendants-Counter Claimants-Appellants.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-60636-AHS

————————————

Before NEWSOM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

This is a breach-of-contract case. World Group Yachting (WGY) and American Marine Tech (AMT) entered into a contract that required AMT to perform engine work on the M/Y Alchemist, a recreational yacht owned by WGY. The signed contract provided a cost estimate of $86,020.42, subject to a 10% increase. Ultimately, AMT invoiced $166,829.58, and over two years later, $55,645.20 of that amount remained outstanding. AMT sued WGY, in personam, and the Alchemist, in rem, for breach of maritime contract to recover the remaining amount. AMT also exercised a maritime lien over the Alchemist for that amount. WGY countersued for breach of contract because AMT's invoices and WGY's payments exceeded the cost estimate.

The district court held a bench trial and ruled in favor of AMT. The court found that "[t]he cost estimate was expressly modified to be increased by $12,000," and that the 10% permitted increase allowed AMT to charge up to $107,822.46. Additionally, the court found that AMT invoiced $106,858.68 for items within the cost estimate and another $59,970.90 for items outside the estimate. The court concluded that a valid and enforceable contract existed between WGY and AMT, and that WGY breached that contract by failing to pay the outstanding balance. WGY appealed.

Before us, WGY raises three issues.  First, WGY asserts that the district court lacked subject matter jurisdiction over this dispute.  Second, on the merits, WGY argues that the district court's decision is a product of clear error.  Third, WGY maintains that the district court abused its discretion by denying WGY's motion for sanctions.  We affirm the district court's decision on all issues.

## I

As a preliminary matter, WGY contends that the district court lacked subject matter jurisdiction because at the time WGY and AMT contracted, the Alchemist was a "dead ship" over which admiralty jurisdiction cannot exist.  "The district court's subject matter jurisdiction is a question of law that we review *de novo* . . . ." *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) (per curiam).  "We review for clear error the district court's fact-findings relevant to jurisdiction." *Id.*

The Constitution grants federal courts jurisdiction over "all Cases of admiralty and maritime Jurisdiction."  U.S. Const. art. III, § 2.  Congress vested federal district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).  Before an in rem admiralty case can proceed in federal district court, however, a maritime lien must exist over the vessel at issue. *The Rock Island Bridge*, 73 U.S. (6 Wall.) 213, 215 (1867).  The Federal Maritime Lien Act grants maritime liens to "a person providing necessaries to a *vessel*." 46 U.S.C. § 31342(a) (emphasis added).  The district court's conclusion that AMT provided necessaries to the Alchemist is not challenged on appeal.

Instead, WGY asserts that the Alchemist was not a "vessel" within the meaning of Federal Maritime Lien Act because it was non-functional when the parties contracted. Thus, it reasons, no maritime lien can exist, which means that no admiralty jurisdiction can exist.

The U.S. Code defines "vessel" as "watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The Supreme Court has held that when a ship is being repaired, its character doesn't depend on whether the repairs are made "while she is afloat, while in dry dock, or while hauled up by ways upon land" because "admiralty jurisdiction extends to all." *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 128 (1919). Indeed, even though the ship in *Hall Brothers* was extremely dilapidated, towed to a shipyard, and placed in drydock for extensive repairs, the Supreme Court held that it was still subject to admiralty jurisdiction during the repair period. *Id.* at 123–24. In *Crimson Yachts v. Betty Lyn II Motor Yacht*, this Court held that a ship "need merely be capable of transportation on water to be a vessel." 603 F.3d 864, 875 (11th Cir. 2010). Although the ship at issue in that case could not self-propel and was drydocked for extensive repairs, this Court held it to be a vessel. *Id.*

WGY asserts that because the Alchemist sat on land without an engine for about a year, its former owners intended to permanently withdraw it from navigation. WGY contends that when AMT entered the contract, the Alchemist was "totally inoperable, had been withdrawn from navigation, and was incapable of being

used" in a functional capacity and was therefore what WGY calls a "dead ship."

But even if the Alchemist's previous owners had stopped using it on the water, WGY sought to repair and resell the yacht at the time of contracting, and the Alchemist remained "capable of being used . . . as a means of transportation on water" within the meaning of 1 U.S.C. § 3 once its engine was repaired. *Accord McCarthy v. The Bark Peking*, 716 F.2d 130, 134–35 (2d Cir. 1983) (holding a museum-exhibit ship that had not operated under her own power for half a century to be a vessel because of her residual capacity of being used as a means of transportation on water); *Farrell Ocean Servs., Inc. v. United States*, 681 F.2d 91, 93 (1st Cir. 1982) ("[A] qualifying 'vessel' is one that is capable of use as a vessel even if not functioning as such at the moment in question."); *Hercules Co., Inc. v. The Brigadier Gen. Absolom Baird*, 214 F.2d 66, 69 (3d Cir. 1954) (rejecting contention that a ship was dead and withdrawn from navigation when she couldn't sail but efforts were being made to ready her for voyage). And the fact that a ship is being repaired does not change her character as a vessel. *See The Jack-O-Lantern*, 258 U.S. 96, 100 (1922) (noting that even when only the skeleton of an old vessel remains and is extensively repaired, admiralty jurisdiction exists). Thus, WGY's argument that the Alchemist ceased being a vessel simply because she sat on land for some time is without merit. The district court properly exercised maritime jurisdiction.

## II

Next, WGY contends that the district court's conclusions regarding the scope of the parties' agreement and the reasonableness of AMT's prices were clearly erroneous. "On appeal from a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1149 (11th Cir. 2018) (quotation marks omitted). We give "due regard to the trial court's opportunity to judge the witnesses' credibility." *Id.* (quotation marks omitted). We reverse factfindings only when, "after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted).

WGY maintains that the parties' only agreement consists of the two-page signed engine-replacement cost-estimate contract. AMT argues that WGY is also subject to certain modifications of the contract and to AMT's terms and conditions included in a service contract that wasn't signed but was included in all communications throughout the negotiations.

At trial, AMT established through witness testimony and past versions of the estimate contract that, initially, it had provided WGY a cost estimate of $115,000 to replace the Alchemist's engines. Then, AMT removed certain tasks from that estimate and reduced it to $86,020.42, and AMT provided a separate estimate of $12,000 for "oil pan modification to accommodate engine installation" and presented various cost options for "drive coupling." All of these iterations of the contract contained AMT's standard terms

and conditions on the back side of AMT's work-order page, titled "service contract." AMT and WGY negotiated a few more points, and eventually, AMT emailed WGY a nine-page document containing the engine-replacement cost estimate, oil-pan modification cost estimate, drive-coupling options, and work-order form with the service contract on its back side. WGY's representative signed and returned only the engine-replacement cost estimate and added a handwritten comment that labor performed by WGY's staff would be subtracted from that cost estimate.

Following the signing, AMT rendered performance per the negotiations and invoiced each of its completed tasks. As AMT's work was ongoing, a WGY representative orally directed AMT to implement drive couplings per one of the options that AMT had set out in its nine-page document. AMT also performed and invoiced the oil-pan modification, which WGY knew about and paid for. And AMT undertook a few extra tasks that were orally requested by a WGY representative overseeing the Alchemist's repairs. For all its materials, AMT charged a 25% markup, which is "standard in the industry" and the same that it charges other customers. And all technicians who worked on the Alchemist recorded their time in daily job reports. AMT's engineer testified that he understood all the work that AMT performed on the Alchemist to be part of AMT's agreement with WGY, and the WGY representative who was present throughout the repairs approved and did not object to any of AMT's work as being outside the parties' agreement. The district court explicitly stated that it found AMT's

engineer's testimony to be "more credible and reliable" regarding the parties' interactions.

Maritime contracts "must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 31 (2004). "[I]t is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract." *Browning v. Peyton*, 918 F.2d 1516, 1521 (11th Cir. 1990). It is not necessary that a contract be in the form of a signed writing to be enforceable. *Id.* at 1520. And the parties may also incorporate contractual terms by reference to a specific unsigned document. *See Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1340 n.9 (11th Cir. 2015).

Here, the district court concluded that although WGY signed only the engine-replacement cost estimate, AMT's other work was part of the parties' agreement because it was necessary to reach the parties' express goal: a total repower of the Alchemist. The court further found that both parties were sophisticated business entities whose representatives had "read, negotiated, and modified the contract over the course of several weeks of discussions"; that AMT clearly intended to incorporate its terms and conditions into the parties' agreement because it included them in each of its communications during negotiations; and that WGY never objected to their inclusion. Moreover, the court found that WGY requested additional work separate from that described in the

engine-replacement cost estimate, such as oil-pan modification and drive couplings; that AMT was therefore correct to charge more than the cost estimate; and that WGY breached the contract by failing to pay the full amount. The district court also found AMT's prices to be reasonable based on AMT's engineer's credible testimony and a lack of records indicating that WGY's staff performed any labor on the Alchemist that would offset AMT's charges.

We do not find any clear error in the district court's factfindings. Given that a WGY representative was present during the repairs and requested additional work, and that WGY paid several invoices for work done outside the engine replacement cost estimate without objection, there is no error in concluding that the parties' scope of agreement transcended the signed cost estimate. WGY's failure to pay the outstanding balance long after the Alchemist resumed operationality constituted material breach; AMT is entitled to recover damages for breach of contract.

## III

Lastly, WGY contends that AMT should have been sanctioned under Federal Rule of Civil Procedure 11 because it "doctored" the parties' signed agreement by appending its terms and conditions page when it submitted the agreement as an exhibit with its complaint. WGY submitted two nearly identical motions for sanctions, both of which also argued that AMT's claims were baseless on the merits.

10                    Opinion of the Court                    21-11336

We review a district court's decision on a Rule 11 motion for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 409 (1990). A "Rule 11 sanction is not a judgment on the merits of an action" but rather "requires the determination of a collateral issue: whether the attorney has abused the judicial process." *Id*. at 396. Here, WGY basically sought to litigate the merits of the breach-of-contract action through a Rule 11 motion by arguing that AMT's terms and conditions were not part of the parties' agreement. The district court did not abuse its discretion in denying WGY's motion.

★ ★ ★

We affirm the district court's exercise of admiralty jurisdiction pursuant to AMT's maritime lien over the Alchemist and hold that the court did not commit clear error in determining the scope of the parties' agreement. Further, the court acted within its discretion in denying WGY's motion for sanctions.

**AFFIRMED**.