[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12242

Non-Argument Calendar

_____

WINDSPEED ENTERPRISE LIMITED,

Plaintiff-Appellant,

*versus*

M/V SEMI 1 et al.,

Defendants,

MODERN AMERICAN RECYCLING & REPAIR SERVICES, LLC,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:21-cv-00523-JB-N

———————————————

Before JORDAN, BRANCH, and MARCUS, Circuit Judges.

PER CURIAM:

Windspeed Enterprises Limited agreed to buy two vessels, M/V SEMI 1 and M/V SEMI 2 ("the Vessels"), from Semi Sub Services BV. While working under a purchase-and-sale agreement (the "Agreement"), Windspeed provided items, crew, and services to the Vessels. But the Agreement's closing date came and went, and Windspeed ended up not purchasing the Vessels. Modern American Recycling & Repair Services, LLC ("MARRS") swept in to buy them instead.

After MARRS's purchase, Windspeed filed an *in rem* complaint to arrest the Vessels, claiming it had a maritime lien under the Commercial Instruments and Maritime Liens Act ("CIMLA") because the items, crew, and services were "necessaries" provided on Semi Sub's orders. MARRS moved to vacate the arrests, arguing that these did not amount to necessaries for purposes of the statute, but instead were conditions precedent to the Agreement and did not give rise to admiralty jurisdiction. The district court

granted the motion to vacate for lack of admiralty jurisdiction, and Windspeed appealed. After careful review, we affirm.

## I.

In January 2020, Windspeed agreed to purchase the Vessels from Semi Sub for $1,350,000. Under the Agreement, Windspeed would take the Vessels "AS IS, WHERE IS, WITH ALL FAULTS AND DEFECTS." Semi Sub made no guarantee that the Vessels were seaworthy or that they complied with any classification society or rules, could pass any inspections, or were eligible for any certifications.

The Agreement also placed obligations for the operation, transport, and costs of the Vessels on Windspeed. Windspeed assumed the duty to transport the Vessels and pay for any fuel, preparation, or outfitting required to do so. More specifically, Windspeed was "responsible for . . . the cost of preparing and making ready the Vessels at the dock for transport (including any fuel, lubricants, stores, consumables, repairs, and other costs) and for transport to International Waters." The Agreement permitted Windspeed to send six workers for each Vessel to familiarize themselves with its operation, but it placed the "sole[] responsib[ility]" with Windspeed to cover "any and all costs[,] expenses[,] liabilities[,] and obligations with respect to any of its personnel on board the Vessels prior to Closing."

At the time that Windspeed entered into the Agreement, the Vessels were in inactive or port status in Coatzacoalcos, Mexico,

where they were leased by Mantenimiento Marino de Mexico S. de R.L. de C.V.  Ten crewmembers of the leasing company worked on each Vessel, and Windspeed sent workers of its own in February 2020 to familiarize themselves with the Vessels.  The goal was to prepare the Vessels for their eventual trip to a scrapyard in India, so Windspeed provided "bunkers, crew, hull cleaning, cost of insurance survey, and flag/class charges."  The leasing company, meanwhile, paid for its own expenses and crew.

After an amendment to the Agreement, the closing date for the sale was set as April 22, 2020.  If the closing fell through, the Agreement stipulated that Semi Sub would retain Windspeed's deposit and that neither party would have liability to the other.  Due to complications from the COVID-19 pandemic, the parties were unable to close by April 22, and the Agreement expired by its own terms.

Windspeed made a new offer to purchase the Vessels, but it placed the price at $300,000 this time around.  Uninterested in the much lower price, Semi Sub declined the offer and looked for new buyers.  On June 21, 2021, it agreed to sell the Vessels to MARRS for $560,000.  They closed the deal in international waters off the coast of Mobile, Alabama, and then MARRS towed the Vessels to a scrapyard in the Port of Mobile.

In December 2021, as the Vessels sat in the Port of Mobile, Windspeed filed an *in rem* complaint against the Vessels under the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, alleging that it had a maritime lien on them

because it had supplied necessaries on Semi Sub's order. *See* Fed. R. Civ. P. Supp. R. C(1)(a) (allowing a plaintiff to file an *in rem* action "[t]o enforce any maritime lien"). On the request of Windspeed, the district court issued a warrant for the arrest of the Vessels and set a bond for their release. *See id.* C(3)(a)(i) (tasking the district court to "review the complaint and any supporting papers" to decide whether an arrest of the vessel and an *in rem* action is appropriate).

MARRS, proceeding in a special appearance as the owner of the Vessels, moved to vacate the arrests under Supplemental Rule E for Admiralty or Maritime Claims and Asset Forfeiture Actions. *Id.* E(4)(f) (providing the "[p]rocedure for [r]elease [f]rom [a]rrest or [a]ttachment). After a hearing, the district court granted the motion, determining that it lacked jurisdiction because Windspeed's provisions were not necessaries but rather conditions precedent to the sale of the Vessels. The court reasoned that, because a contract over the sale of a vessel does not give rise to maritime jurisdiction, the Agreement could not give rise to a maritime lien. As a result, Windspeed failed to demonstrate probable cause to support the Vessels' arrests, and the district court lacked jurisdiction over the matter.

This timely appeal followed.

## II.

The only issue on appeal is whether the district court erred in vacating the arrests of the Vessels for lack of admiralty

jurisdiction because Windspeed did not have a maritime lien on the Vessels. We review *de novo* a district court's dismissal for lack of admiralty jurisdiction. *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 868 (11th Cir. 2010). We also review *de novo* whether a party's claim gives rise to a maritime lien. *Minott v. M/Y Brunello*, 891 F.3d 1277, 1280 (11th Cir. 2018).

Federal courts have jurisdiction over "all [c]ases of admiralty and maritime [j]urisdiction." U.S. Const. art. III, § 2; *see also* 28 U.S.C. § 1333(1). In deciding whether a contract claim falls under our maritime jurisdiction, we focus "on the nature of the contract, as to whether it has reference to maritime service or maritime transactions." *Nehring v. Steamship M/V Point Vail*, 901 F.2d 1044, 1048 (11th Cir. 1990) (quotation marks omitted). But "a contract for the sale of a ship is not a maritime contract." *S.C. Loveland, Inc. v. E. W. Towing, Inc.*, 608 F.2d 160, 164 (5th Cir. 1979).[1] That means that contract claims over the sale of a vessel are not cases within admiralty and maritime jurisdiction. *Cooper v. Meridan Yachts, Ltd.*, 575 F.3d 1151, 1166 (11th Cir. 2009) ("[A] contract for the sale or construction of a ship is not within the federal courts' admiralty jurisdiction."); *Hatteras of Lauderdale, Inc. v. Gemini Lady*, 853 F.2d 848, 850 (11th Cir. 1988); *Richard Bertram & Co. v. Yacht Wanda*, 447 F.2d 966, 967 (5th Cir. 1971).

---

[1] All Fifth Circuit decisions handed down before the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

22-12242                Opinion of the Court                7

Cases of admiralty jurisdiction also can include *in rem* actions over vessels themselves, but "[a]n *in rem* admiralty proceeding requires as its basis a maritime lien." *Crimson Yachts*, 603 F.3d at 868; *see also The Rock Island Bridge*, 73 U.S. (6 Wall) 213, 215 (1867) ("The lien and the proceeding *in rem* are, therefore, correlative -- where one exists, the other can be taken, and not otherwise."). "A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim, and it attaches the moment the debt arises." *Crimson Yachts*, 603 F.3d at 1228 (quotation marks omitted). Under the CIMLA, "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel . . . [and] may bring a civil action *in rem* to enforce the lien." 46 U.S.C. § 31342(a)(1)–(2). So, "to obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent." *Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244 (11th Cir. 1999); *accord Barcliff, LLC v. M/V DEEP BLUE, IMO No. 9215359*, 876 F.3d 1063, 1068 (11th Cir. 2017). The necessaries must also be provided at a reasonable price. *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).

The statute defines "necessaries" to "include[] repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). But "[t]he word 'includes' in this definition was not intended to be exhaustive." *Bradford Marine, Inc. v. M/V Sea Falcon*, 64 F.3d 585, 589 (11th Cir. 1995). Instead, necessaries "has been liberally construed to include what is reasonably needed in

the ship's business, such as goods or services that are useful to the vessel, keep her out of danger and enable her to perform her particular function." *Id.* (quotation marks omitted).

Under Supplemental Rule E for Admiralty or Maritime Claims and Asset Forfeiture Actions, "any person claiming an interest in [an arrested vessel] shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Fed. R. Civ. P. Supp. R.  E(4)(f). As the parties, the district court, and other courts have all agreed, "[t]he post-arrest hearing is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant, and if so, to fix an appropriate bond." *Salazar v. Atlantic Sun*, 881 F.2d 73, 79–80 (3d Cir. 1989); *accord World Fuel Servs. Singapore PTE, Ltd. V. M/V*, 727 F. App'x 811, 814 (5th Cir. 2018); *Mujahid v. M/V Hector*, 948 F.2d 1282, at *1 (4th Cir. 1991) (unpublished table opinion); *20th Century Fox Film Corp. v. M.V. Ship Agencies, Inc.*, 992 F. Supp. 1423, 1427 (M.D. Fla. 1997).

Here, Windspeed did not provide "reasonable grounds" for the arrests because Windspeed did not provide sufficient evidence that it had a maritime lien.  For starters, the Agreement at the heart of this case is a contract for the sale of the Vessels.  Consequently, the Agreement is not a maritime contract, so it does not create a maritime lien, and it does not give rise to maritime jurisdiction. *See Cooper*, 575 F.3d at 1166. *Cf. Chase Manhattan Fin. Servs., Inc. v. McMillian*, 896 F.2d 452, 457 (10th Cir. 1990) (observing that

contracts to construct a vessel "do not create 'maritime' liens because such contracts are not 'maritime' contracts").

Since Windspeed cannot rely on the Agreement as a maritime contract, it claims that it had a maritime lien on the Vessels because its provision of "necessaries" to the Vessels created one. We disagree. No one disputes that Windspeed delivered bunkers, fuel, and crew to the Vessels, and also provided for cleaning services, insurance, and flag administration and class survey costs. But, as alleged in its own verified complaint, Windspeed did so "[p]ursuant to the terms and conditions of the [A]greement and in preparation to take delivery of the Vessels." The Agreement's terms back this up, placing the obligation to supply for the fuel, preparation, and costs of the Vessels onto Windspeed.

To the extent Windspeed claims that those provisions were necessaries *separable from* the Agreement, again, we disagree. Its own complaint alleged that those provisions were requirements under the Agreement. "In order for a contract to fall within the federal admiralty jurisdiction, it must be wholly maritime in nature, or its non-maritime elements must be either insignificant or separable without prejudice to either party." *Inbesa Am., Inc. v. M/V Anglia*, 134 F.3d 1035, 1036 (11th Cir. 1998). Windspeed offered no evidence that its provisions were separable from the Agreement, especially considering the Agreement's repeated requirement that Windspeed bear the burden of getting the Vessels ready for sailing. *See Hatteras of Lauderdale*, 853 F.2d at 850–51 (holding that "customization" done under a contract for the sale of

a vessel to make it "function as intended" did not give rise to a maritime contract); *Gaster Marine Recovery & Sales, Inc. v. M/V The Restless I*, 33 F. Supp. 2d 1333, 1335 (S.D. Fla. 1998) (holding that repair work "pursuant to the parties' Brokerage Agreement" in order to assist the sale of the vessel was not "independent of and separable from the 'nonmaritime' sale element of the Brokerage Agreement").

Lastly, we are unconvinced by Windspeed's argument that because it never closed on the Vessels, it obtained a maritime lien based on services performed in furtherance of the Agreement. The purpose of Windspeed's provisions was to secure the purchase of the Vessels. Even though "[t]he deal for the purchase of the Vessel[s] never closed," "[t]he substance of [Windspeed's] complaint clearly involves a contract for the sale of the Vessel[s], which was not maritime in nature." *Villaflores v. Royal Venture Cruise Lines, Ltd.*, No. 96-2103-Civ, 1997 WL 728098, at *1, 3 (M.D. Fla. Nov. 17, 1997). Windspeed's failure to close did not suddenly turn its contractual performance into a maritime lien. It does not cite any case law or other authority that suggests otherwise.

Without a maritime contract, Windspeed never obtained a maritime lien, and, without a maritime lien, the district court did not have *in rem* jurisdiction over the Vessels. *See Crimson Yachts*, 603 F.3d at 868. Vacatur of the arrests was proper.

**AFFIRMED.**